FOOD TOWN STORES, INC., Petitioner v. CITY OF SALISBURY, Respondent

BRAD RAGAN, INC., Petitioner v. CITY OF SALISBURY, Respondent

BRAD RAGAN REALTY COMPANY, Petitioner v. CITY OF SALISBURY, Respondent

B. V. HEDRICK GRAVEL AND SAND COMPANY, HEDRICK REALTY AND INVESTMENT COMPANY, AND 601 INDUSTRIAL DEVELOPMENT CORPORATION, Petitioners v. CITY OF SALISBURY, Respondent

No. 21

(Filed 6 May 1980)

**1. Municipal Corporations § 2.2— annexation—method of counting lots**

In an action challenging the validity of an annexation ordinance adopted by respondent city, the trial court did not err in determining that the city's

method of counting lots in a subdivision for the purpose of establishing compliance with the requirements of G.S. 160A-48 was calculated to provide reasonably accurate results, since the city considered a group of lots in single ownership and used for a single purpose as being a single tract; and it was reasonable for the city to follow actual use and ownership patterns in a particular subdivision where the subdivision consisted of numerous lots which were twenty-five feet in width, but actual development in the area had proceeded without regard to the lot lines in the subdivision plat, and in fact deed restrictions for the project required ownership of three lots before development could occur.

**2. Municipal Corporations § 2.2 — annexation — method of lot calculation — different method used previously**

The fact that different methods of lot calculation have been used by a city in past annexations is of no import where the record establishes that the method utilized in the annexation under scrutiny complies with the requirements of G.S. 160A-54.

**3. Municipal Corporations § 2.2 — annexation — four lots counted as one used for industrial purposes — no error**

In an action challenging the validity of an annexation ordinance adopted by respondent city, the trial court did not err in finding that four parcels of property owned by a grocery store were correctly counted by the city as one tract which was being used for industrial purposes, since two of the tracts contained the warehouse-office complex of the grocery store; all of the tracts were contiguous; of the 68.51 usable acres, over 20 were under roof or pavement and an additional 8.5 acres had been graded and filled for future expansion; and the two tracts which did not have buildings on them were used to support the industrial improvements on the other tracts in that they were used for a sediment basin to control erosion, fill material was taken from one tract to use in construction on another tract, and one tract contained employee parking facilities.

**3. Municipal Corporations § 2; Dedication § 4 — annexation — portions of streets excluded from lot computation — areas not subject to withdrawal from dedication**

The trial court did not err in concluding that respondent city properly excluded from its computation of lots and tracts eight areas in a subdivision which constituted unopened portions of streets which were otherwise opened and maintained by the State, since the areas in question were not subject to withdrawal from dedication on the date of annexation.

**5. Municipal Corporations § 2.2 — annexation — land used for industrial purposes — classification proper**

The trial court did not err in concluding that a particular parcel of land was properly classified by respondent city as being used for commercial and industrial purposes, even though a portion of the parcel may have been vacant, since part of the land was being used for a laundry, part was used as a storage yard or facility in conjunction with the laundry operations, and part was vacant, but petitioner did not offer evidence disclosing what percentage of the

Food Town Stores v. City of Salisbury

parcel was vacant, and it was therefore impossible to determine whether the lot was vacant to such an extent as to require its division into separate lots or tracts.

**6. Municipal Corporations § 2.6— annexation—extension of municipal services—plan in compliance with statute**

The trial court correctly concluded that respondent city's plans for extension of municipal services satisfied the requirements of G.S. 160A-47(3)a where the city's report indicated that the number of full-time policemen would be increased from 49 to 53 and police vehicles from 19 to 20; the existing patrol districts would be realigned to include the proposed annexations; the city would acquire a new fire engine and would contract with a volunteer fire department to aid in furnishing fire protection until a complete municipal water distribution system was available in the areas proposed to be annexed; and the areas to be annexed could be included in the existing garbage collection routes without additional increase in equipment and personnel.

**7. Municipal Corporations § 2.2— annexation—use test—margins of error**

The language of G.S. 160A-54 is free from ambiguity and represents a legislative determination that margins of error should be allowed with respect to the calculations made by a municipality to establish compliance with the population and subdivision tests of G.S. 160A-48(c) but not with respect to the calculations made to establish compliance with the use test of G.S. 160A-48(c); therefore, the trial court erred in concluding that the incorrect percentage of use figures submitted by respondent city were within the five percent margins of error allowed by G.S. 160A-54 and were thus sufficient to establish compliance with the use test.

**8. Municipal Corporations § 2.2— annexation—land classified as residential—land not in use for qualifying purpose**

The trial court did not err in determining that a parcel of land, classified by respondent city as residential, was not in use for a qualifying purpose where the evidence tended to show that the house on the land had not been used as a dwelling for eleven years; a visual inspection indicated that the building was unkept, that the back porch had completely fallen in, and that the front porch and front porch roof members were sagging; and the house was not suitable for human habitation and did not meet applicable city codes. Furthermore, evidence that the house was being used "more or less" for storage or as a warehouse was insufficient to support a finding that the structure was in industrial or commercial use.

**9. Evidence § 48— expert in real estate—opinion as to habitability of property—admissibility**

Evidence that a witness had been engaged in real estate development for over forty years, in home building since 1951, that he had been involved in the development of eighteen subdivisions, over two hundred residential homes and also condominiums was sufficient evidence from which the trial court could properly determine that the witness possessed the requisite skill to form an opinion as to the habitability of a structure on a parcel of land which respondent city had classified as residential.

**10. Municipal Corporations § 2.2— annexation—land classified as residential—land not in use for qualifying purpose**

The trial court properly found that there was no habitable dwelling unit on a parcel of land which the city had classified as residential and the court thus properly concluded that the parcel was not being used for a qualifying purpose where there was evidence tending to show that some six months after the annexation ordinance was passed there was no home on the lot, but there was rubble indicating past construction.

**11. Municipal Corporations § 2.2— annexation—land used for ball park—improper finding that land not in use for qualifying purpose**

The trial court erred in concluding that a parcel of land was not in use for commercial, industrial, institutional or governmental purposes where the evidence tended to show that the land contained two fenced baseball fields, permanent bleachers, night lights, a concession stand and a parking area; these facilities advanced the object of the Rowan Little League, Inc., a non-profit entity, which was to promote little league baseball activities and to construct and maintain little league facilities for the benefit of the youth of the county; and the construction, maintenance, and promotion of little league facilities was a use possessing the characteristics of urban life.

**12. Municipal Corporations § 2.2— annexation—use test—failure of city to count qualifying lot—no authority of court to add lot**

Judicial review of an annexation ordinance is limited to determination of whether the annexation proceedings substantially comply with the requirements of the applicable annexation statute, and a reviewing court does not have authority to amend an annexation ordinance by recognizing a previously uncounted lot for purposes of establishing compliance with the use test of G.S. 160A-48(c)(3); therefore, the trial court erred in adding another lot to the annexation report and ordinance submitted by respondent city, even though the city presented evidence which established that, as a result of an error in the tax maps, it had failed to include an additional qualifying lot within the boundaries of an area in the annexation report and ordinance.

Justice COPELAND did not participate in the decision of this case.

APPEAL by petitioners from judgment of *Walker, S.J.,* entered 13 February 1979 in ROWAN Superior Court.

On 27 June 1978 the governing board of the City of Salisbury adopted an ordinance providing for the annexation of certain areas of land referred to as Area A and Area B. Petitioners own property in the area described in the ordinance as Area A. Pursuant to the provisions of G.S. 160A-50, petitioners in apt time filed a petition in the Superior Court of Rowan County seeking review of the ordinance adopted by the governing board of the City of Salisbury. From judgments affirming the ordinance, peti-

tioners appealed to this Court, assigning errors discussed in the opinion.

Evidence necessary to understand the various assignments of error will be narrated in the discussion of the assignment to which the evidence relates.

*Thomas M. Caddell and Dwight L. Crowell III, for Food Town Stores, Inc., petitioner appellant.*

*Clarence Kluttz and Malcolm B. Blankenship, Jr., of Kluttz and Hamlin, for Brad Ragan, Inc., Brad Ragan Realty Co., B. V. Hedrick Gravel and Sand Company, Hedrick Realty and Investment Co., and 601 Industrial Development Corp., petitioner appellants.*

*Margaret R. Short, City Attorney; H. Michael Boyd, of Constangy, Buckley & Boyd, for City of Salisbury, respondent appellee.*

HUSKINS, Justice.

In the review proceedings below, petitioners challenged the validity of an annexation ordinance adopted by the City of Salisbury on 27 June 1978 as the culmination of simultaneous annexation proceedings held pursuant to the terms of G.S. 160A-45, *et seq.* Only one of the two areas annexed, Area A, was the subject of the review proceeding.

On its face, the record of the annexation proceedings submitted by the City in Superior Court demonstrated substantial compliance with all applicable provisions of G.S. 160A-45, *et seq.* Thus, the burden was on petitioners, who appealed from the annexation ordinance, to show by competent evidence that the City in fact failed to meet the statutory requirements or that there was irregularity in the proceedings which materially prejudiced their substantive rights. *In re Annexation Ordinance,* 278 N.C. 641, 180 S.E. 2d 851 (1971); *Huntley v. Potter,* 255 N.C. 619, 122 S.E. 2d 681 (1961). *See generally,* G.S. 160A-50(f), (g).

Both petitioners and respondent bring forward numerous assignments of error which challenge the correctness of specific findings of fact and conclusions of law made by the trial court in the review proceedings below. On appeal, the findings of fact

made below are binding on this Court if supported by the evidence, even though there be evidence to the contrary. *Conover v. Newton*, 297 N.C. 506, 256 S.E. 2d 216 (1979); *In re Annexation Ordinances*, 253 N.C. 637, 117 S.E. 2d 795 (1961). Conclusions of law drawn by the trial court from its findings of fact are reviewable *de novo* on appeal. *Harrelson v. Insurance Co.*, 272 N.C. 603, 158 S.E. 2d 812 (1968).

[1] G.S. 160A-54 provides that "[i]n determining population and degree of land subdivision for purposes of meeting the requirements of G.S. 160A-48, the municipality shall use methods calculated to provide reasonably accurate results." Petitioners contend the trial court erred in determining that the method used by the City to determine the number of lots in Area A for purposes of establishing compliance with the requirements of G.S. 160A-48 was calculated to provide reasonably accurate results.

The method utilized by the City in the instant proceedings is stated on the last page of the annexation report:

"The Rowan County tax and subdivision maps have been used to determine the number of lots and tracts as well as their acreage. There are several methods which can be used in determining what is a lot or tract in making an appraisal of an area to be annexed. The method used in this report considered a group of lots in single ownership and used for a single purpose as being a single tract and referenced by a single tax map parcel number. Where a single ownership tract was divided by a street right-of-way, the resulting division was counted as multiple tracts rather than one tract."

Petitioners object strenuously to this method because within the area to be annexed was a subdivision known as Milford Terrace which was formally subdivided into numerous lots which were 25 feet in width. Petitioners contend the City's method of lot calculation is unreasonable because it fails to follow the formal pattern of subdivision in Milford Terrace.

G.S. 160A-54 does not specify any particular method by which a municipality is to calculate the number of lots in the area to be annexed; rather, it requires that the method chosen be "calculated to provide reasonably accurate results." The reasonableness of the method chosen is to be determined in light

of the particular circumstances presented by the annexation proceedings in question.

Review of the record in the instant case indicates that the actual development of the Milford Terrace area has proceeded without regard to the lot lines in the recorded subdivision plat. It is obvious that lots 25 feet in width cannot be developed individually but only in groups. In fact, deed restrictions for the Milford Terrace Housing Project require ownership of three lots before development can occur. Under these circumstances, it is eminently reasonable for the City to follow actual use and ownership patterns instead of artificial patterns of subdivision in determining the number of lots in the area to be annexed. Such method of lot counting was calculated to provide reasonably accurate results as required by G.S. 160A-54.

[2] Petitioners argue that the City in past annexations has followed subdivision boundaries and that failure to do so in this case was arbitrary and capricious. This argument is without merit. Our previous discussion of G.S. 160A-54 indicates that a municipality is not tied to any particular method of calculating the number of lots so long as the method utilized is calculated to provide reasonably accurate results. The fact that different methods of lot calculation have been used by the City in past annexations is of no import where, as here, the record establishes that the method utilized in the annexation under scrutiny complies with the requirements of G.S. 160A-54. This assignment is overruled.

[3] Petitioner Food Town contends the trial court erred in its finding of fact that Food Town's property was correctly counted as one lot or tract rather than separate lots or tracts. The parcels in question—labeled A through D—are contiguous and house Food Town's continually expanding office and warehouse operations. The property is in a triangle formed by Harrison Road and the Western North Carolina Railroad, which converge upon the Highway 601-Bypass. The property is served by a spur railroad and by three natural gas lines. Of 68.51 usable acres, over twenty are under roof or pavement. An additional 8.5 acres behind the warehouse have been graded and filled for future expansion.

Petitioner Food Town argues that the above mentioned improvements are contained within parcels C and D; that parcels A

and B are, in essence, unimproved and ought to be counted separately. Review of the record, however, indicates that parcels A and B are being actively used to support the industrial improvements housed within parcels C and D. Food Town has stipulated that a sediment basin and earthen dam was constructed in 1976 on parcel B in conjunction with construction and grading activities in parcels C and D. Food Town was required by erosion and sediment control laws to make these improvements on parcel B in order to carry out the construction on parcels C and D. *See* G.S. 113A-50, *et seq.* The sediment basin in parcel B controls erosion on the rear portions of parcels C and D and protects nearby streams from sedimentation. "Said sediment basin has remained in existence since construction in 1976 and presently forms a part of Food Town's present plans for complying with applicable laws regarding erosion and sediment control." Trial Stipulations, No. 31 (Filed 11 December 1978). Additionally, tract B has been the source of fill material needed for construction activities on tracts C and D. Employee parking facilities on tract C have been expanded onto tract A. A bank 15 to 20 feet in height is located at the "boundary" between parcels A and B and the warehouse on parcels C and D. The bank consists of fill used for construction activities on parcels C and D.

This constitutes sufficient evidence to support a finding that Food Town is using the entire tract as a single tract. Had Food Town not owned tracts A and B, its actual use and development of the remaining tracts would have been seriously impacted. It could not have constructed improvements and a 15-to-20-foot bank along the very edge of the old boundaries of tracts A and B. Off-site transportation of fill material would have been necessary. Compliance with environmental regulations would have been more difficult.

*R. R. v. Hook,* 261 N.C. 517, 135 S.E. 2d 562 (1964), relied upon by petitioner, is factually distinguishable. In *Hook,* the 14-acre tract in question was not contiguous to the tract containing the primary industrial plant; rather, it was separated from this tract by a highway. Approximately one acre of this tract was used for employee parking, the remainder was graded and being held for *possible* industrial use. There was no evidence that the remaining acreage was "being used either directly or indirectly for industrial purposes. All of the evidence [tended] to show

that it was not being *used* for any purpose." *Id.*, 261 N.C. at 520. Under these circumstances, the Court concluded that the tract in question could not be considered as one lot being used for industrial purposes; rather, the parking area had to be considered as an industrial lot and the remaining acreage as an unused lot. In the instant case the tracts in question are adjacent to the tracts containing the Food Town warehouse — office complex and are actively *used* to support and facilitate the industrial use of the adjacent tracts. Unlike *Hook*, the contiguous portions of the Food Town property are essential to the use of the entire tract for industrial purposes. Accordingly, we hold that the trial court did not err in finding that the Food Town property was correctly counted as one tract which is being used for industrial purposes.

[4] Petitioner Food Town contends the trial court erred in concluding that the City properly excluded from its computation of lots and tracts eight areas in the Milford Terrace subdivision which constitute unopened portions of streets in the subdivision which are otherwise opened and maintained by the State. Petitioners ground this contention on the possibility that these unmaintained portions of the street system may at some time in the future be withdrawn from dedication under G.S. 136-96. This contention is without merit. "It is now well settled [that] the dedication of a street may not be withdrawn, if the dedication has been accepted and the street *or any part of it* is actually opened and used by the public." *Russell v. Coggin*, 232 N.C. 674, 62 S.E. 2d 70 (1950) (emphasis added). Review of the record indicates that the areas in question were not subject to withdrawal from dedication on the date of annexation since such areas were but unopened portions of streets which were otherwise actually opened and used by the public. We note, moreover, that land may not be withdrawn from dedication until the fee owners record in the register's office a declaration withdrawing such land from the use to which it has been dedicated. G.S. 136-96; *Sheets v. Walsh*, 215 N.C. 711, 2 S.E. 2d 861 (1939). There is no evidence in the record indicating that such declaration had been filed by the fee owners of the areas in question. We hold, therefore, that the trial court properly concluded that these areas were dedicated to public use as streets on the date of annexation and were thus properly excluded by the City in its computation of lots.

Petitioner Food Town contends the trial court erred in con-
cluding that two lots marked IX and X on Exhibit 27A were prop-
erly excluded by the City in its computation of lots and tracts in
the area to be annexed. This contention is without merit. Com-
parison of the marks made on Exhibit 27A with the map showing
in detail the boundaries of the area to be annexed (Exhibit D,
Amendments to the Annexation Report) indicates that the alleged
lots would either have to be within the city limits or within the
railroad right-of-way. Thus, the trial court properly concluded
that the lots in question were not within the area to be annexed.
This assignment is overruled.

[5]   Petitioner Food Town contends the trial court erred in con-
cluding that parcel 34 on tax map 450 was properly classified by
the City as being used for commercial and industrial purposes.
Evidence was presented tending to show that parcel 34 was
under the same ownership; that part of parcel 34 was already
within the city limits and was being used by a laundry; that the
part of parcel 34 being annexed contains a storage yard or facility
which is used by the laundry; that in determining that parcel 34
was used for commercial and industrial purposes, consideration
was given to the fact that the storage facility in the unannexed
portion of parcel 34 was being used in conjunction with the laun-
dry operations on the portion of parcel 34 already within the City.
This constitutes sufficient evidence from which the trial court
could find that the predominant use of parcel 34 was industrial in
nature.

Nonetheless, petitioner argues that evidence tending to show
that portions of parcel 34 were vacant warrants a finding that
substantial portions of the lot were vacant. Thus, according to
petitioner, parcel 34 should have been counted as two lots—one
vacant and one industrial. The record, however, fails to disclose
what percentage of parcel 34 was vacant. As a result, it is im-
possible to determine whether the lot was vacant to such an ex-
tent as to require its division into two separate lots or tracts. The
burden of proof was on petitioner on this point. Failure to meet
this burden leaves the City's prima facie case intact. *Huntley v.
Potter*, supra. Accordingly, we hold that the trial court did not
err in upholding the City's classification of parcel 34. This assign-
ment is overruled.

[6] In its annexation report the City must include a statement setting forth the plans of the municipality for extending certain enumerated municipal services to the area to be annexed on the date of annexation "on substantially the same basis and in the same manner as such services are provided within the rest of the municipality prior to annexation." G.S. 160A-47(3)a. Petitioners contend the trial court erred in concluding that the plans submitted by the City for extending police protection, fire protection and garbage collection complied with the requirements of G.S. 160A-47(3)a.

With respect to police protection, the City's report notes in pertinent part that on 21 March 1978 the governing board had approved an organizational change in the police department to become effective 1 July 1978. This change realigned the existing patrol districts to include the proposed annexations and increased the number of full-time officers from 49 to 53 and police vehicles from 19 to 20. The foregoing establishes prima facie full compliance with G.S. 160A-47(3)a in relation to extension of police protection. Review of the record indicates that petitioners failed to carry the burden of showing otherwise with respect to these matters.

With respect to extending fire protection, the report provides, in pertinent part, that delivery on a "new 1,000 gpm pumper" engine was expected in June, 1978, and that the City would contract with the Locke Volunteer Fire Department (VFD) to aid the City in furnishing fire protection until a complete municipal water distribution system was available in the two areas proposed to be annexed. At trial, Salisbury's Fire Chief testified that, in fact, the City had contracted for additional fire protection with the Franklin VFD, which had a larger tanker capacity. The Fire Chief indicated that with the exception of the Milford Terrace Subdivision, there were fire hydrants in all portions of Area A, that there was a fire hydrant at the edge of the city limits within 1200 feet of any point in Milford Terrace, and that residential fires could be effectively fought in an area where the nearest hydrant was 1200 feet away. Finally, the Fire Chief indicated that the contract with the Franklin VFD was merely supplementary and that there was no point in Area A that would require a greater response time to a fire alarm than would be required in any other portion of the City. The foregoing constitutes

Food Town Stores v. City of Salisbury

sufficient evidence to support a finding and conclusion that the City's plans for extending fire protection comply with G.S. 160A-47(3)a.

With respect to garbage collection, the report provides, in pertinent part, that the areas to be annexed will be included within existing routes without additional increase in equipment and personnel. At trial, the Sanitation Superintendent testified that Area A would be serviced by adding it to a collection route which is presently a short route. Even with Area A included, the route would still be considered a short one. It takes about four and one half hours to complete an average collection route. Sanitation workers get paid for eight hours, even if they finish their assigned routes in less time. Thus, servicing Area A would not present manpower problems. A dumpster hoister unit—one of four—which burned out would be replaced. In the interim, service could be provided to Area A on substantially the same basis as in other areas within the city limits. The foregoing constitutes sufficient evidence to support a finding and conclusion that the City's plans for extending garbage collection comply with G.S. 160A-47(3)a.

We note, finally, that petitioners have failed to demonstrate that any material prejudice resulted from the City's decision to jointly discuss plans for extending municipal services to both areas to be annexed in one statement rather than discussing each area separately. See G.S. 160A-50(g).

In summary, the trial court correctly concluded that the City's plans for extension of municipal services satisfied the requirements of G.S. 160A-47(3)a.

Petitioners bring forward assignments of error directed to the trial court's failure to compel discovery under Rule 37 of the Rules of Civil Procedure. We have carefully considered these assignments and find no prejudicial error which warrants the granting of a new trial.

Finally, we turn to the several assignments and cross-assignments challenging the trial court's determination that Area A met the 60 percent use requirement imposed by G.S. 160A-48(c)(3), which provides that the area to be annexed must be so developed such that "at least sixty percent (60%) of the total

number of lots and tracts in the area at the time of annexation are used for residential, commercial, industrial, institutional, or governmental purposes. . . ."

The annexation report and ordinance prepared by the City indicated that Area A contained 62 lots and tracts, 39 of which were being used for qualifying purposes. This yields a percentage figure of 62.9, which exceeds the statutory requirement. After hearing evidence, the trial court found that three of the 39 lots purportedly being used for qualifying purposes were not, in fact, being used for such purposes. However, the trial court further found that there was one additional qualifying lot within Area A which the City had failed to count. These findings decreased the number of lots being used for qualifying purposes to 37 of 63. The resulting percentage of use was thus reduced from 62.9 percent as determined by the City to 58.7 percent, which is below the statutory requirement. Nonetheless, the court concluded as a matter of law that the 58.7 percent use figure was within the 5 percent margin of error permitted under G.S. 160A-54 and thus determined that the City had complied with the 60 percent use requirement of G.S. 160A-48(c)(3).

The first question arising out of this final series of assignments, then, is whether the 5 percent margins of error permitted by G.S. 160A-54(2) and (3) apply to figures submitted by the City indicating compliance with the use requirement of G.S. 160A-48(c)(3).

The 5 percent error margins allowed by G.S. 160A-54(2) and (3) expressly apply to certain calculations made by the City for purposes of determining compliance with the requirements of G.S. 160A-48(c). Accordingly, resolution of the question posed requires us to consider the provisions of G.S. 160A-48(c) in conjunction with those of G.S. 160A-54.

G.S. 160A-48(c) provides:

"(c) Part or all of the area to be annexed must be developed for urban purposes. An area developed for urban purposes is defined as any area which meets any one of the following standards:

(1) Has a total resident population equal to at least two persons for each acre of land included within its boundaries; or

(2) Has a total resident population equal to at least one person for each acre of land included within its boundaries, and is subdivided into lots and tracts such that at least sixty percent (60%) of the total acreage consists of lots and tracts five acres or less in size and such that at least sixty percent (60%) of the total number of lots and tracts are one acre or less in size; or

(3) Is so developed that at least sixty percent (60%) of the total number of lots and tracts in the area at the time of annexation are used for residential, commercial, industrial, institutional or governmental purposes, and is subdivided into lots and tracts such that at least sixty percent (60%) of the total acreage, not counting the acreage used at the time of annexation for commercial, industrial, governmental or institutional purposes, consists of lots and tracts five acres or less in size."

It should be noted that G.S. 160A-48(c) prescribes three *alternative* standards for determining whether the area to be annexed is developed for urban purposes. The first standard imposes a population test. The second standard imposes a population and subdivision test. The third standard imposes a use and subdivision test. In the instant case, the City was proceeding under the third standard.

G.S. 160A-54 provides in pertinent part:

"§ 160A-54. Population and land estimates. — In determining population and degree of land subdivision for purposes of meeting the requirements of G.S. 160A-48, the municipality shall use methods calculated to provide reasonably accurate results. In determining whether the standards set forth in G.S. 160A-48 have been met on appeal to the superior court under G.S. 160A-50, the reviewing court shall accept the estimates of the municipality:

*      *      *      *

(2) As to total area if the estimate is based on an actual survey, or on county tax maps or records, or on aerial photographs, or on some other reasonably reliable map used for official purposes by a governmental agency, unless the petitioners on appeal demonstrate that such estimates are in error in the amount of five percent (5%) or more.

(3) As to degree of land subdivision, if the estimates are based on an actual survey, or on county tax maps or records, or on aerial photographs, or on some other reasonably reliable source, unless the petitioners on appeal show that such estimates are in error in the amount of five percent (5%) or more."

Due consideration of the plain language of G.S. 160A-54 in conjunction with the provisions of G.S. 160A-48(c) compels the conclusion that the 5 percent error margins it allows apply exclusively to calculations made by the municipality for purposes of establishing compliance with the population and subdivision tests contained within the alternative standards prescribed by G.S. 160A-48(c).

At the outset, G.S. 160A-54 provides that "[i]n determining *population* and *degree of land subdivision* for purposes of meeting the requirements of G.S. 160A-48, the municipality shall use methods calculated to provide reasonably accurate results." (Emphasis added.) Subsections (2) and (3) of section 54 then provide that if estimates as to total area and degree of subdivision in the area to be annexed are based on certain enumerated sources, then the reviewing courts shall accept the estimate of the municipality "unless the petitioners on appeal demonstrate that such estimates are in error in the amount of five percent (5%) or more." Calculations as to total area are necessary to determine compliance with the population and subdivision tests prescribed in G.S. 160A-48(c). Calculations as to degree of land subdivision are of course necessary to determine compliance with the subdivision tests prescribed in G.S. 160A-48(c). On the other hand, the *use test* prescribed in G.S. 160A-48(c) does not require calculations of total area or degree of subdivision in the area to be annexed. Similar provisions for error margins are not made in G.S. 160A-54 with respect to the calculations necessary to determine compliance with the use test.

[7] If the language of a statute is free from ambiguity and expresses a single, definite, and sensible meaning, judicial interpretation is unnecessary and the plain meaning of the statute controls. *Mazda Motors v. Southwestern Motors*, 296 N.C. 357, 250 S.E. 2d 250 (1979). The language of G.S. 160A-54 is free from ambiguity and represents a legislative determination that margins of error should be allowed with respect to the calculations made by a municipality to establish compliance with the population and subdivision tests of G.S. 160A-48(c) but not with respect to the calculations made to establish compliance with the use test of G.S. 160A-48(c). It is not for us to determine the wisdom of this determination. *Commissioners v. Henderson*, 163 N.C. 114, 79 S.E. 442 (1913). The meaning of the law is plain and we must apply it as written. *In re Poindexter's Estate*, 221 N.C. 246, 20 S.E. 2d 49 (1942).

Accordingly, we hold that the 5 percent margins of error set out in G.S. 160A-54 do not apply to figures submitted by a municipality indicating compliance with the use test of G.S. 160A-48(c). The trial court thus erred in concluding that the incorrect percentage of use figures submitted by the City were within the five percent margins of error allowed by G.S. 160A-54 and were thus sufficient to establish compliance with the use test.

The conclusion we reach dictates that the 62.9 percentage of use figure submitted by the City must stand on its own merits, without benefit of the error margins allowed in G.S. 160A-54. As a result, it now becomes necessary to consider the correctness of the trial court's determination that only 37 of 63 lots in Area A (58.7%) were being used for qualifying purposes. The trial court arrived at this figure by finding that the following lots or tracts, which the City asserted were being used for qualifying purposes, were, in fact, not so used: (1) Parcel 82, Block C, Tax Map 331B; (2) Parcel 97, Tax Map 331B; (3) Parcel 9, Tax Map 450. Additionally, the trial court found that there was an additional qualifying parcel within Area A—Parcel 36, Tax Map 450A—which the City had failed to account for in its original report and annexation ordinance. The soundness of each of these findings and conclusions will be discussed seriatim.

[8] The trial court found that the house located on Parcel 82 was not a habitable dwelling unit on 16 May 1978—the date the an-

nexation report was submitted to the governing board—and thus concluded that said parcel of land, classified by the City as residential, was not in use for a qualifying purpose. There is competent evidence in the record supporting the trial court's finding. There was evidence tending to show that the house had not been used as a dwelling for eleven years; that a visual inspection undertaken in December, 1978 indicated the building was unkept, that the back porch had completely fallen in, that the front porch and front porch roof members were sagging, and that the house was not suitable for human habitation and would not meet applicable City codes.

[9] The City contends the trial court erroneously determined that petitioner's expert witness, Leo Wallace, was qualified to give an opinion as to the habitability of the structure on Parcel 82. This contention is without merit. The competency of a witness to testify as an expert in the particular matter at issue is addressed primarily to the sound discretion of the trial court, and its determination is not ordinarily disturbed by the reviewing court. *Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 189 S.E. 2d 705 (1972); 1 Stansbury's N.C. Evidence § 133 (Brandis rev. 1973). In the instant case, Mr. Wallace testified that he had been engaged in real estate development for over forty years, in home building since 1951, that he had been involved in the development of eighteen subdivisions, over two hundred residential homes, and also condominiums. This constitutes sufficient evidence from which the trial court could properly determine that Mr. Wallace possessed the requisite skill to form an opinion as to the habitability of the structure on Parcel 82.

[8] Finally, the City contends that the trial court erred in failing to determine that Parcel 82 was in industrial or commercial use. The City relies on testimony by petitioners' witnesses that the structure on Parcel 82 was being used "more or less" for storage or as a warehouse. The testimony relied on by the City fails to specify the extent of such storage activities and whether such activities were carried out in pursuance of a commercial or industrial enterprise. In any event, even though there be evidence to the contrary, this Court is bound by the trial court's finding that Parcel 82 was not being used for a qualifying purpose, which we have determined is supported by competent evidence. *See, In*

*re Annexation Ordinances, supra,* 253 N.C. at 644. The City's cross-assignment with respect to Parcel 82 is overruled.

[10]  The trial court found there was no habitable dwelling unit located on Parcel 97 on 16 May 1978 and thus concluded that said parcel, classified by the City as residential, was not being used for a qualifying purpose. Review of the record indicates there is competent evidence to support the finding of the court. There is evidence tending to show that in December, 1978, some six months after the annexation ordinance was passed, there was no home on the lot; rather, there was rubble indicating past construction, "a few old brick and some dirt piled up." Accordingly, the City's cross-assignment to the trial court's finding with respect to Parcel 97 is overruled.

[11]  The trial court concluded that Parcel 9 was not in use for commercial, industrial, institutional or governmental purposes on 16 May 1978. Located on Parcel 9 is the Little League Ball Park or the Shell Oil Park. All of the pertinent evidence regarding the ball park is the subject of stipulation. The ball park consists of two fenced baseball fields. Permanent bleachers, night lights and a cinderblock concession stand have been erected. The field and concession stand are operated during the baseball season by the Rowan County Little League, Inc., a non-profit corporation organized "[t]o promote little league baseball activities and to construct and maintain little league facilities for the benefit of the youth of the County." Exhibit 4, Articles of Incorporation. Profits from the concession stand and revenues generated from advertising placed along the outfield fences are used by the Rowan County Little League, Inc., in its tax-exempt purpose of providing an opportunity for young children to play baseball. The fee simple title to the lot is held by Shell Oil, Inc., which leases the land free of charge to the Rowan County Little League, Inc.

In our view, Parcel 9 on Tax Map 450 is being used for institutional purposes. Accordingly, we hold that the trial court erred as a matter of law when it concluded that said parcel was not in use for a qualifying purpose.

The term "institutional" is not specially defined in the laws governing annexation by cities of more than 5,000 in population. Absent a special or technical definition or other clear indication to the contrary, words in a statute must be given their common

and ordinary meaning. *Food House, Inc. v. Coble, Sec. of Revenue*, 289 N.C. 123, 221 S.E. 2d 297 (1976); *In re Clayton-Marcus Co.*, 286 N.C. 215, 210 S.E. 2d 199 (1974). The term "institutional" refers to or pertains to matters originated by an "establishment, organization, or association, instituted for the promotion of some object, [especially] one of public or general utility, religious, charitable, educational, etc. . . ." 5 The Oxford English Dictionary at 354 (1933). Within the context of G.S. 160A-48(c)(3), "institutional" refers to an urban use of land which directly advances the goals or objects of the organization making use of the land. Such a definition of "institutional" comports not only with the ordinary meaning of the word but also with the legislative policy of encouraging "sound urban development" by permitting annexation only of land which is "developed for urban purposes." *Compare* G.S. 160A-45(1) *with* G.S. 160A-48(c). Certainly, the urban use of land by an institution which directly advances its goals or objects is a use which possesses the essential characteristics of urban development.

Application of the above definition to the instant facts compels the conclusion that Parcel 9 on Tax Map 450 is being used for institutional purposes. The fenced baseball fields, permanent bleachers, night lights, concession stand, and parking area directly advance the object of the Rowan Little League, Inc., a nonprofit entity, which is to promote little league baseball activities and to construct and maintain little league facilities for the benefit of the youth of the county. Needless to say, the construction, maintenance and promotion of little league facilities is a use possessing the characteristics of urban life.

To summarize, we have determined that the trial court was not totally correct in its conclusion that three of the lots which the City claimed were being used for qualifying purposes were not, in fact, being used in such a manner. As to two of these lots—Parcel 82, Block C, Tax Map 331B, and Parcel 97 on Tax Map 331B—the trial court is correct. As to the third lot—Parcel 9 on Tax Map 450—the trial court erred in concluding that it was not being used for a qualifying purpose. Thus, of the sixty-two lots which the annexation report and ordinance indicate are contained in Area A, thirty-seven are actually being used for qualifying purposes. This yields a percentage figure of 59.6, which is below the statutory requirement.

[12]   At this junction, consideration of the additional qualifying lot found by the trial court within the boundaries of Area A becomes crucial, for recognition of this lot would raise the count to thirty-eight of sixty-three lots being used for qualifying purposes. Recognition would thus increase percentage of usage from 59.6, below the statutory minimum, to 60.3, above the minimum. Neither petitioner disputes the findings of the trial court confirming existence of a sixty-third lot which is being used for a qualifying purpose. A question arises, however, as to whether a reviewing court has authority, in effect, to amend an annexation ordinance by recognizing a previously uncounted lot for purposes of establishing compliance with the use test in G.S. 160A-48(c)(3).

We previously considered this question in *Huntley v. Potter*, supra, and determined that the courts do not have authority to amend the annexation report or ordinance. Judicial review of an annexation ordinance is limited to determination of whether the annexation proceedings substantially comply with the requirements of the applicable annexation statute. *See* G.S. 160A-50(f); *Huntley v. Potter, supra; In re Annexation Ordinance,* 284 N.C. 442, 202 S.E. 2d 143 (1974); *In re Annexation Ordinance,* 278 N.C. 641, 180 S.E. 2d 851 (1971). The reviewing court may affirm the action of the governing board, remand to the governing board for amendment with respect to such noncompliance as is found, or declare the action of the board to be null and void. G.S. 160A-50(g). "If the record of annexation proceedings on its face fails to show substantial compliance with any essential provision of the Act, the superior court upon review must remand to the governing board for amendment with respect to such noncompliance. The court itself is without authority to amend the report, ordinance or other part of the record. This is true even if evidence is presented which justifies amendment." *Huntley v. Potter*, supra, 255 N.C. at 627-28 (citations omitted).

Application of the above principles impels the conclusion that the reviewing court here had no authority to add a sixty-third lot to the annexation report and ordinance submitted by the City. This is so, even though the City presented evidence which established that, as a result of an error in the tax maps, it had failed to include an additional qualifying lot within the boundaries of Area A in the annexation report and ordinance. Concededly, such evidence justifies amendment of the annexation report and

ordinance. However, the correction of such oversight is not within the province of the reviewing court; rather, amendments to the annexation report and ordinance must be made by the governing board in accordance with procedures outlined in G.S. 160A-45, *et seq.*

Accordingly, we hold that Area A does not meet the 60 percent use test of G.S. 160A-48(c)(3) since only thirty-seven of the sixty-two lots or tracts (59.6 percent) mentioned in the annexation ordinance are being used for qualifying purposes. The judgment of the trial court affirming the action of the governing board without change is reversed. In accordance with G.S. 160A-50(g)(2) this cause is remanded to the Superior Court of Rowan County for further remand to the municipal governing board of the City of Salisbury for amendment of Area A lot boundaries — if the City be so advised — to reflect the sixty-third qualifying lot, the inclusion of which would conform the annexation ordinance under attack to the requirements of G.S. 160A-48(c)(3).

Reversed and remanded.

Justice COPELAND did not participate in decision of this case.