THOMAS L. THRASH AND LORA R. THRASH v. CITY OF ASHEVILLE, A MU-
NICIPAL CORPORATION, W. LOUIS BISSETTE, MAYOR OF THE CITY OF ASHEVILLE,
MARY LLOYD FRANK, VICE-MAYOR OF THE CITY OF ASHEVILLE, WALTER
BOLAND, WILHELMINA BRATTON, GEORGE TISDALE, NORMA PRICE
AND KENNETH MICHALOVE, CITY COUCILPERSONS OF THE CITY OF ASHEVILLE

BASF CORPORATION v. CITY OF ASHEVILLE

JOHN F. TYNDALL AND WIFE, HELEN TYNDALL, WILLARD HINTZ AND WIFE,
ELIZABETH HINTZ, ALVA L. WALLIS, JR. AND WIFE, KANNIE WALLIS,
BEULAH WILSON AND INA N. FISHER v. CITY OF ASHEVILLE

No. 8828SC1261

(Filed 19 September 1989)

1. **Municipal Corporations § 2.1— annexation—challenge to—
burden of proof**

An annexation ordinance which recites compliance with
all applicable statutory provisions establishes prima facie
substantial compliance with those provisions and the burden
is on the petitioners challenging the ordinance to show by
competent evidence that the City in fact failed to meet the
statutory requirements.

2. **Municipal Corporations § 2.2— annexation—number of lots**

The court did not err in reviewing an annexation ordinance
by classifying a tract known as the Owenby property as eighteen
separate lots, each less than five acres in size, where the
property was subdivided by a plat recorded 25 March 1976
showing eighteen lots and two roads; the owner conveyed
the entire property to his daughter in 1984 by a deed in which
the property was described by metes and bounds; and the
deed restricted the use of the property to residential purposes
with construction to be similar to an adjacent subdivision.
The property may be considered as separate lots even though
it remains undeveloped because the subdivision was recorded
with the Register of Deeds; the 1984 restrictive covenant showed
a lack of intent to actually withdraw the subdivision plat,
even though the 1984 transfer was without reference to the
subdivision plat; and the present owner received eighteen
separate tax bills on the property until 1987, when she re-
quested that the lots be consolidated for tax purposes. N.C.G.S.
§ 160A-42(2).

**3. Municipal Corporations § 2.2 — annexation — property counted as separate lots**

The City did not err in an annexation by counting as separate lots the Heyward and Ball properties where all of the lots were listed as separate lots for tax purposes; the Heyward property consisted of four contiguous lots, three of which were landlocked without access from the fourth, and only one of which had a residence and was in a subdivision; the Ball lots consisted of two adjacent lots with one requiring access over the other; the two Ball lots were acquired ten years apart; and the Heyward lots were acquired in three separate conveyances. N.C.G.S. § 160A-54(3) permits the use of county tax maps to determine subdivision and petitioners in the instant case have failed to show that the City's classifications of their properties were not reasonably accurate.

**4. Municipal Corporations § 2.2 — annexation — classification as to use**

The City in an annexation properly classified a 47-acre tract as in commercial use where all of the 47 acres except 19.75 acres had been developed as a commercial shopping center; the remaining 19.75-acre tract was contiguous to the shopping center and had been cleared and graded and easements had been acquired to serve it; trash and stumps had been dumped on the 19.75 acres during construction of the shopping center; and a Southern Bell long distance line also ran through the property. Although the property was unimproved except for clearing and grading, it indirectly served the shopping center as a dumping ground.

**5. Municipal Corporations § 2.2 — annexation — institutional use — no error**

The City properly classified 5.92 acres owned by the local school board as being in institutional use for annexation purposes where the property, known as "Scratch Ankle," had been used through the summer of 1986 by an agricultural class at Enka High School for growing crops; crops were not grown in the summer of 1987 due to the relocation of the high school, which required that the agriculture instructor do specific work at the new school; the property was not adjacent to Enka High School either before or after its relocation; and there was testimony that the agriculture class had

grown crops almost every summer since 1973 and was expected to do so again in the summer of 1988. Because of the consistent use of the property for institutional purposes for about thirteen years prior to the trial, its present disuse was treated as merely a brief hiatus which would not disqualify the property from being in urban use.

6. **Municipal Corporations § 2.6— annexation — extension of police services**

The trial court did not err in an annexation challenge by finding that the City's report of plans for the extension of police service to the annexed area meets the requirements of N.C.G.S. § 160A-47 where the City promised to provide the full range of police protection on the same basis and manner as in the present municipality, the City's report outlined the specific services it currently provides to include a regular patrol division, criminal patrol investigation, ordinance enforcement and traffic control; and the City was willing to commit to specific new acquisitions of personnel and equipment, particulars not generally provided.

7. **Municipal Corporations § 2.6; Sanitary Districts § 3— annexation — water and sewer district — not a municipal corporation**

The trial court did not err in an annexation challenge by holding that the City could lawfully annex part of a water and sewer district because, although a water and sewer district has certain powers, it is much more limited in its authority and responsibilities than a general municipal corporation and does not qualify as a municipal corporation for purposes of Ch. 160A.

8. **Municipal Corporations § 2.5; Sanitary Districts § 3— annexation — water and sewer district — outstanding bonds**

The existence of outstanding bonds was not a bar to annexation of part of a water and sewer district where the City Manager and other officials began trying to negotiate an equitable distribution of revenue with county staff prior to the adoption of the annexation ordinance and letters were introduced from the City outlining proposals to provide sewer service and maintenance to the area and for an equitable distribution of costs and revenues associated with the sewer construction project.

**9. Municipal Corporations § 4.2— annexation—1928 resolution by City promising no annexation—ultra vires**

The trial court properly concluded in an annexation challenge that a 1928 resolution in which the City stated that it would oppose annexation of property now owned by BASF Corporation was ultra vires and did not estop the City from annexing the property. The power to annex is a discretionary power which must remain unfettered for the public good; any attempt by the City to abridge this governmental power in 1928 was ultra vires and gives BASF no right of action for noncompliance. Moreover, this is not a case in which manifest injustice will result from failure to apply equitable estoppel.

**10. Municipal Corporations § 2.2— annexation—industrial use**

The trial court did not err in an annexation challenge by classifying a 17.7-acre tract along Hominy Creek as vacant rather than as in industrial use where the record supports the trial court's finding that a large part of the 17.7 acres consists of Hominy Creek and that BASF pumps water from the creek for industrial use and also discharges effluent into the creek, there were pipes across the creek carrying water from a reservoir outside the annexation area to the BASF plant, and another pipe transmitted steam from the BASF plant area to its office area.

**11. Municipal Corporations § 2.2— annexation—size of tract— finding supported by evidence**

The trial court's finding in an annexation challenge that an area owned by BASF measured 3.85 acres was supported by competent evidence and was therefore binding on appeal even if there was some evidence to the contrary. It was therefore unnecessary to consider the question of classification because, even if the parcel should have been designated as vacant rather than as in industrial use, it would merely comprise another lot of five acres or less which would improve the City's position.

Judge GREENE dissenting.

APPEAL by petitioners from Sitton, Claude S., Judge. Judgment entered 20 May 1988 in Superior Court, BUNCOMBE County. Heard in the Court of Appeals 17 May 1989.

## THRASH v. CITY OF ASHEVILLE

[95 N.C. App. 457 (1989)]

This is a consolidated civil action brought pursuant to G.S. sec. 160A-50 for judicial review of an ordinance passed by the City of Asheville to annex into the corporate limits a certain territory west of the City. Initial review of these petitions in a nonjury trial resulted in affirmance of the annexation ordinance with only minor adjustment concerning calculation of acreage owned by petitioner BASF Corporation and others. From the judgment upholding the ordinance, petitioners appealed in apt time.

*Adams, Hendon, Carson, Crow & Saenger, P.A., by S. J. Crow and Martin K. Reidinger, for petitioner-appellants Thrash.*

*Moore & Van Allen, by Daniel G. Clodfelter and Douglas R. Ghidina, for petitioner-appellant BASF Corporation.*

*Herbert L. Hyde for petitioner-appellants Tyndall, et al.*

*William F. Slawter and Sarah Patterson Brison for respondent-appellee City of Asheville.*

JOHNSON, Judge.

I

FACTS

On 9 June 1987, the City of Asheville adopted resolution number 87-104 stating its intent to consider the annexation of certain territory west of the City, known as the west annexation area, and announcing the date of a public hearing on the question. On 23 June 1987, the City adopted a resolution approving a plan for the extension of major municipal services into the west annexation area. This plan was amended twice during the month of August.

On 25 August, the City adopted resolution number 1649 which extended the City's corporate limits to include the west annexation area. This resolution stated that the area to be annexed met the statutory requirements of G.S. sec. 160A-48, entitled "[c]haracter of area to be annexed" which sets forth the extent of urban development that is required before an area may be annexed. This statute includes the following relevant requirements:

(a) A municipal governing board may extend the municipal corporate limits to include any area

 (1) Which meets the general standards of subsection (b), and

 (2) Every part of which meets the requirements of either subsection (c) or subsection (d).

 (b) The total area to be annexed must meet the following standards:

  (1) It must be adjacent or contiguous to the municipality's boundaries at the time the annexation proceeding is begun.

  (2) At least one-eighth of the aggregate external boundaries of the area must coincide with the municipal boundary.

  (3) No part of the area shall be included within the boundary of another incorporated municipality.

 (c) Part or all of the area to be annexed must be developed for urban purposes. An area developed for urban purposes is defined as any area which meets any one of the following standards:

  . . . .

  (3) Is so developed that at least sixty percent (60%) of the total number of lots and tracts in the area at the time of annexation are used for residential, commercial, industrial, institutional or governmental purposes, and *is subdivided into lots and tracts such that at least sixty percent (60%) of the total acreage, not counting the acreage used at the time of annexation for commercial, industrial, governmental or institutional purposes consists of lots and tracts five acres or less in size.* (Emphasis added.)

The amended report of plans to extend services, which was fully incorporated into resolution 1649, stated that the City had met both of the requirements of G.S. sec. 160A-48(c)(3), known as the "use" test and the "subdivision" test, in the following manner:

 The area to be annexed is developed for urban purposes as defined in the N.C. General Statutes 160A-48(c)(3) in that 558 of the total 724 lots and tracts in the area are used for residential, commercial, industrial, institutional, or governmental pur-

poses or 77.1% and is subdivided into lots and tracts such that 64.9% of the total acreage, not counting the acreage used at the time of annexation for commercial, industrial, governmental, or institutional purposes, consists of lots and tracts five acres or less in size. Acres of land in this area not used for commercial, industrial, governmental or institutional purposes is 680.4 acres of which 441.8 acres are divided into lots and tracts of five acres or less.

## II

### BURDEN OF PROOF

[1] Before addressing these and other issues, we note that an annexation ordinance before the Court which recites compliance with all applicable statutory provisions establishes *prima facie* substantial compliance with these provisions, and the burden is on the petitioners challenging the ordinance to show by competent evidence that the City in fact failed to meet the statutory requirements. *In re Annexation Ordinance*, 278 N.C. 641, 180 S.E.2d 851 (1971); *Dale v. Morganton*, 270 N.C. 567, 155 S.E.2d 136 (1967).

The issues raised by petitioners Thrash and BASF largely relate to the City's compliance with the second half of G.S. sec. 160A-48(c)(3) above, the subdivision test. This test can be expressed as the following fraction:

$$\frac{\text{vacant \& residential acreage} \le 5 \text{ acres}}{\text{total vacant \& residential acreage}}$$

## III

### PROPERTY UNDER SUBDIVISION TEST

### (A) OWENBY PROPERTY

[2] First, petitioners contend that the court erred in finding that the City correctly classified property known as the Owenby property as eighteen separate lots, each less than five acres in size. This property, an undeveloped subdivision, was subdivided by a plat recorded 25 March 1976 showing eighteen lots and two roads. In 1984, the owner conveyed the entire property to his daughter by a deed in which the property was described by metes and bounds. The deed, however, restricted use of the property to residential purposes with construction to be similar to a certain adjacent subdivision.

G.S. sec. 160A-42 provides that for purposes of complying with the land subdivision requirement of G.S. sec. 160A-36, "the municipality shall use methods calculated to provide reasonably accurate results." The statute also provides that the reviewing court is to accept estimates "based on an actual survey, or on county tax maps or records, or on aerial photographs, or on some other reasonably reliable source." G.S. sec. 160A-42(2).

The City substantiates subdivision of the Owenby property into eighteen lots each of five acres or less by a recorded plat which shows the subdivision. This source is one which under G.S. sec. 160A-42(2) should be considered to be reasonably reliable. To prevail on appeal, petitioners have the burden of showing by competent evidence that the City's *prima facie* case must fail. *Thompson v. City of Salisbury*, 24 N.C. App. 616, 211 S.E.2d 856, *cert denied*, 287 N.C. 264, 214 S.E.2d 437 (1975). This petitioners have failed to do.

This Court addressed the issue of undeveloped subdivisions in the context of the "use" test in *Williams v. Town of Grifton*, 19 N.C. App. 462, 199 S.E.2d 288 (1973). In *Williams*, this Court held that where a map showing subdivision of an undeveloped tract in an area to be annexed had only been recorded with the tax collector and not in the office of the Register of Deeds, the town properly considered the property one tract since it did not have proper record notice of subdivision. No lots in *Williams* had been conveyed in the portion of the tract to be annexed. The opinion implied that if the subdivision plat of the undeveloped subdivision had been recorded with the Register of Deeds, the property could have been considered separate lots. In the instant case the subdivision was recorded with the Register of Deeds. Therefore, under *Williams*, the property may be considered as separate lots even though it remains undeveloped.

Petitioners argue, however, that the 1984 transfer without reference to the subdivision plat effectively withdrew the offer of dedication. They cite *Rowe v. Durham*, 235 N.C. 158, 69 S.E.2d 171 (1952), which held that a conveyance without reference to streets or lots withdrew the offer of dedication. We think that *Rowe* is factually distinguishable from the case at bar. In this case, the deed, although not specifically referring to the plat, did convey the property subject to a covenant which restricts the property's use to residential development similar to an adjacent subdivision. This language shows a lack of intent on the part of the grantor

to actually withdraw the subdivision plat sufficient in our judgment to justify the City's classification of the Owenby property as eighteen lots. It is also noteworthy that the present owner of the Owenby property indicated in her trial testimony that she received eighteen separate tax bills on the property up until the early fall of 1987 when she requested that the county tax office consolidate the lots for tax purposes. This request was made after adoption of the annexation ordinance by the City.

The method used by the City to determine subdivision was authorized by statute, and the court's findings will not be disturbed on appeal. This assignment is overruled.

### (B) HEYWARD AND BALL PROPERTIES

[3] Second, petitioners contend that the City erred in counting as separate lots certain properties owned by the Heywards and the Balls. The Heywards own four contiguous lots, three of which are landlocked without access from the fourth. The Balls own two adjacent lots in which one lot requires access over the other. Both the Balls' and Heywards' lots are listed as separate lots for tax purposes. One of the Heyward lots has a residence on it and is in a subdivision and their other lots are not. Mr. Heyward testified that his property was acquired in separate conveyances in 1967, 1971, and 1975. The two Ball lots were acquired ten years apart.

G.S. sec. 160A-54(3) permits the use of county tax maps, as used here, to determine subdivision. A municipality is not bound to any one method of calculating the number of lots as long as it provides reasonably accurate results. *Food Town Stores v. City of Salisbury*, 300 N.C. 21, 265 S.E.2d 123 (1980); *Scovill Mfg. Co. v. Town of Wake Forest*, 58 N.C. App. 15, 293 S.E.2d 240, *disc. rev. denied*, 306 N.C. 559, 294 S.E.2d 371 (1982) (holding that a tract was properly classified as six lots even though one lot had a residence on it, another had landscaping, and the owner considered the tract as one entity where estimate was based on recorded plats, tax maps, deeds, an aerial photograph and personal observation). Petitioners in the instant case have failed to show that the City's classifications of their properties were not reasonably accurate. Therefore, we uphold them.

IV

PROPERTY UNDER USE TEST

(A)  WESTRIDGE PROPERTY

[4]  We now turn to two parcels which petitioners urge were improperly classified as to use. The first, known as the Westridge property, consists of a 47-acre tract of which all but 19.75 acres has recently been developed as a commercial shopping center. The remaining 19.75 acres which are contiguous to the shopping center have been cleared and graded and easements have been acquired to serve it. The entire tract was acquired as two parcels, one of about six acres and the other over 41 acres. The present owners consolidated the two tracts for development and also for tax purposes. One of the owners testified that trash and stumps were dumped on the 19.75 acres during construction of the shopping center. A Southern Bell long distance line also runs through the property.

An area is improperly classified as in commercial use if there is no evidence that the land is being used either directly or indirectly for such purpose. *Southern Railway Co. v. Hook*, 261 N.C. 517, 135 S.E.2d 562 (1964). Property need not be actually under roof or pavement to be in commercial use for purposes of annexation. *Food Town Stores, Inc., supra*. Determining whether property has been correctly classified as to use turns on the particular facts of each case. *Huyck Corp. v. Town of Wake Forest*, 86 N.C. App. 13, 356 S.E.2d 599, *disc. rev. granted*, 320 N.C. 631, 360 S.E.2d 87 (1987), *aff'd per curiam*, 321 N.C. 589, 364 S.E.2d 139 (1988).

In the instant case, we hold that the entire Westridge property was properly classified as commercial. The 19.75 acres in question are contiguous to the rest of the property. Although it is unimproved except for clearing and grading, it has indirectly served the shopping center as a dumping ground. We also consider it important that, unlike the property in *Hook, supra*, such a high percentage of the 47-acre tract, approximately 58%, is in direct use for the shopping center. This assignment of error is overruled.

(B)  "SCRATCH ANKLE" PROPERTY

[5]  Next, petitioners urge that a tract of 5.92 acres owned by the local school board was improperly classified as being in institutional use. The trial court found that the property, known as

**THRASH v. CITY OF ASHEVILLE**

[95 N.C. App. 457 (1989)]

"Scratch Ankle," had been used through the summer of 1986 by an agricultural class at Enka High School for growing crops. Due to relocation of the high school which required that the agriculture instructor do certain specific work at the new school, crops were not grown in the summer of 1987. The property in question was not adjacent to Enka High School either before or after its relocation. There was testimony that the agriculture class had grown crops almost every summer since 1973 and was expected to do so again in the summer of 1988. Although the property was not in use at the time of trial, old cornstalks were still standing on the tract.

G.S. sec. 160A-48(c)(3) requires that a lot be in institutional use at the time of annexation in order to qualify as in institutional use. Also, actual use rather than ownership of the property is determinative. *Hook, supra.* We concede that the use classification of the property in the instant case is an extremely close question. The evidence tends to show that only because of the unusual circumstance that Enka High School was in the process of relocating, was Scratch Ankle not used for the agriculture class as it has been most summers since 1973. Because of the consistent use of the property for institutional purposes for about thirteen years prior to the trial, we are inclined to treat its present disuse as merely a brief hiatus which would not disqualify the property from being in urban use. In so holding, we are guided by the rule that the trial court's findings of fact are binding on this Court if supported by competent evidence, even if there is evidence to the contrary. *Huyck Corp., supra.*

V

EXTENSION OF POLICE PROTECTION SERVICES

[6] We now address the Tyndall petitioners' contention that the court erred in finding that the City's report of plans for the extension of police protection into the annexed area meets the requirements of G.S. sec. 160A-47. We disagree.

The City of Asheville provided the following information about police protection in its report on extension of municipal services:

*Police Protection*

On and after the effective date of annexation, the full range of police services will be provided to the area on the

same basis and manner as provided within the rest of the City. These services include a regular patrol division, criminal investigations, ordinance enforcement and traffic control.

Services will be provided with five (5) additional officers for the Patrol Division. Also, three (3) additional detectives and one (1) office assistant will be hired and assigned to the City's Criminal Investigations Bureau and the Juvenile Services Division. A total of five (5) vehicles will also be purchased to support the additional personnel. Total cost for the additional services which will be shared between the proposed South Buncombe annexation area and proposed West annexation area will be approximately $274,156.

Funding for these services will be provided in the annual budget process.

G.S. sec. 160A-47(3) requires that a municipality's annexation report for extending major municipal services into the area to be annexed must provide for extending services, including police protection, "on substantially the same basis and in the same manner as such services are provided within the rest of the municipality prior to annexation." G.S. sec. 160A-47(3)(a).

We first note that petitioners bear the burden of showing by substantial competent evidence that the City has failed to comply with G.S. sec. 160A-47(3). *In re Annexation Ordinance (Charlotte)*, 304 N.C. 549, 284 S.E.2d 470 (1981). Further, it is presumed that public officials act impartially in the performance of their official duties. *Id.* Our Supreme Court has held that in order to meet this requirement, the municipality's report must provide sufficient information to allow the public and the courts to assess whether the municipality has committed itself to a nondiscriminatory level of service to the annexed area. *Cockrell v. City of Raleigh*, 306 N.C. 479, 293 S.E.2d 770 (1982). To do this, the Court in *Cockrell* held that a report must contain "(1) information on the level of services then available in the City, (2) a commitment by the City to provide this same level of services in the annexed area within the statutory period, and (3) the method by which the City will finance the extension of these services." *Id.* at 484, 293 S.E.2d at 773, *quoting In re Annexation Ordinance (Charlotte), supra* at 554-55, 284 S.E.2d at 474.

**THRASH v. CITY OF ASHEVILLE**

[95 N.C. App. 457 (1989)]

Petitioners assert that the City has failed to provide sufficient detail as to the present level of services so that the public and the courts can determine whether service will be extended in a nondiscriminatory manner. In *In re Annexation Ordinance (Charlotte), supra*, our Supreme Court upheld a police protection report which stated as to the present level of services that it provided 24 hour a day protection and gave immediate response to calls. The report also stated that the police provide a variety of services from traffic control to crime investigation and use the most modern equipment. Mention was made of services already provided to the annexed area. In upholding the report, the Court found sufficient detail to satisfy G.S. sec. 160A-47(3) especially in light of details provided on the scope of services available. *Id.* Interestingly, the petitioners in *In re Annexation Ordinance (Charlotte), supra*, argued that the report was deficient for failing to specify the number of additional personnel and equipment which would be required. The Court denied this contention, stating that that degree of specificity was unnecessary in order to determine after the fact whether the city had provided the services promised. *Id. In re Annexation Ordinance (Charlotte)* also quoted with approval another plan for extension of services from *In re Annexation Ordinance*, 255 N.C. 633, 122 S.E.2d 690 (1961), which stated that calls for aid were presently answered in 5.5 minutes and named the particular patrol which would be extended into the annexed area.

We believe that, in light of the flexibility shown by the Court in *In re Annexation Ordinance (Charlotte), supra*, that the report in the instant case should be upheld. The City promises to provide the full range of police protection on the same basis and manner as in the present municipality. The report then outlines the specific services it currently provides to include a regular patrol division, criminal investigation, ordinance enforcement and traffic control. The City has shown good faith substantial compliance with G.S. sec. 160A-47(3) in its outline of present services. We are especially inclined to consider it adequate in light of the City's willingness to commit to specific new acquisitions of personnel and equipment. These particulars are generally not provided. Petitioners have made no effort to show that the increased acquisitions planned are insufficient.

The City has made a *prima facie* showing of substantial compliance with the requirements of G.S. sec. 160A-47(3). Petitioners

have not met their burden of proving by competent evidence that the City failed to comply. This assignment is overruled.

VI

ENKA-CANDLER WATER AND SEWER DISTRICT

[7]  The Tyndall petitioners next contend that the court erred in holding that the City could lawfully annex part of the Enka-Candler water and sewer district. They base this argument on G.S. sec. 160A-48(b)(3) which states that "[n]o part of the area [to be annexed] shall be included within the boundary of another incorporated municipality." These petitioners point out that they are organized as a water and sewer district under G.S. sec. 162A-88. This statute, entitled "District is a municipal corporation," states in part that "[t]he inhabitants of a county water and sewer district . . . are a body corporate and politic" with certain corporate powers, including the right to acquire and hold real property. G.S. sec. 162A-88.

The question petitioners raise is whether a water and sewer district, which under Chapter 162A is termed a municipal corporation, is also a municipal corporation for purposes of annexation under Chapter 160A. To determine this, we first turn to the definition of "city" in Chapter 160A which states in relevant part the following:

"City" means a municipal corporation organized under the laws of this State for the better government of the people within its jurisdiction and having the powers, duties, privileges, and immunities conferred by law on cities, towns, and villages. The term "city" does not include counties or municipal corporations organized for a special purpose.

G.S. sec. 160A-1(2).

We hold that a water and sewer district is a municipal corporation organized for a special purpose which does not qualify as a municipal corporation for purposes of Chapter 160A. Although a water and sewer district has certain powers, it is much more limited in its authority and responsibilities than a general municipal corporation which provides police and fire protection, street maintenance, and often a host of other services such as parks and recreation.

THRASH v. CITY OF ASHEVILLE

[95 N.C. App. 457 (1989)]

We find support for our position that the district is not a municipality for purposes of Chapter 160A in *Sanitary District v. Lenoir*, 249 N.C. 96, 105 S.E.2d 411 (1958). In *Sanitary District* (decided under a prior annexation statute), our Supreme Court held that the word "municipality" does not "comprise sanitary districts or other quasi-municipal corporations." *Id.* at 100, 105 S.E.2d at 414. *See also Housing Authority v. Johnson Comr. of Revenue,* 261 N.C. 76, 134 S.E.2d 121 (1964). The Court in *Sanitary District,* went on to say that "the word was intended to mean cities and towns and is limited to that meaning." *Sanitary District, supra.* Petitioners argue that their corporation is not designated as "quasi-municipal" under G.S. sec. 162A-88, but as "municipal," and therefore is distinguishable from a sanitary district. We find this contention unpersuasive in light of the clear language of *Sanitary District* that only cities and towns constitute municipalities for annexation purposes, and conclude that the City of Asheville does not violate G.S. sec. 160A-48(b)(3) in annexing part of the Enka-Candler water and sewer district.

[8] Next, the Tyndall petitioners argue that the part of Enka-Candler water and sewer district in question should not be annexed because the district has issued bonds of $1,500,000 to pay for sewer lines for which residents already pay an ad valorem tax on all property in the district. Petitioners contend there is no provision in the annexation ordinance to relieve them of this obligation upon annexation.

Our careful examination of the record reveals, however, that petitioners have overstated their case. The City Manager and other officials began trying to negotiate an equitable distribution of revenue with county staff prior to adoption of the annexation ordinance. No resolution has been reached, but the City introduced two letters at trial, one to the Chairman of the Buncombe County Board of Commissioners from the City Manager, and the other to the Planning Director and Finance Director of the County from the City Audit and Budget Director and the City Director of Water and Sewer Operations. Both letters, which apparently did not receive responses, outline proposals to provide sewer service and maintenance to the area and for an equitable distribution of costs and revenues associated with the sewer construction project.

Although the parties have not yet reached a final resolution, we are confident that in light of the proposals made by the City

to date, an equitable solution will be reached and this is not a bar to annexation of the area.

## VII

## BASF PROPERTY

[9] Next, corporate petitioner BASF argues that the trial court erred in concluding that certain statements made by the City in 1928 to BASF's predecessor in interest, American Enka Corporation, were *ultra vires*, and in concluding that the City is not as a result of the statements estopped from annexing the property of BASF Corporation. Petitioner refers to a statement made in a letter to American Enka in 1928 which the City formalized in a resolution later that year:

> That owing to the distance of the proposed plant location from the City Limits of the City of Asheville, and the vast amount of vacant land lying between said location and said City Limits, that the incorporation of said plant and land adjoining the same into the City of Asheville is impractical, and said City of Asheville would oppose such a proposition.

This resolution was to apply also to American Enka's successors, subsidiaries or assigns. Both parties agree that in 1928 only the General Assembly had the power to annex. This situation gave rise to the language that the City "would oppose such a proposition."

Petitioner argues that this resolution was a valid exercise of the City's proprietary function since it was a promise made to induce American Enka to locate near the City. Respondent City of Asheville contends that the resolution was invalid as an attempt to bind the City in the exercise of its governmental discretionary powers. We agree with the City.

Our Supreme Court has authoritatively set forth the distinction between governmental and proprietary functions:

> It is true, as a rule that where governmental discretionary powers are involved a board can make no contract which would bind its successors in office with respect to the exercise of the discretion. Amongst the powers generally conceded to be accompanied by such governmental discretion, and which cannot be suspended or controlled by contract, are usually classed the legislative powers of the governing body — the power to

make ordinances and decide upon public questions of a purely governmental character (and under this head must be classed most of the strictly governmental discretionary powers, since the body acts as a whole and usually by ordinance or resolution); the power to lay out and maintain streets, to build bridges and viaducts over which they lead, preserve civil order; to regulate rates (where power to do so is given in the charter); to levy taxes, make assessments, and the like. These are mentioned simply by way of illustration and only roughly indicate the quality of the power we are discussing. "A public function is one which is exercised by virtue of certain attributes of sovereignty delegated to a city for the health and protection of its inhabitants, or the public." *McLeod v. Duluth*, 174 Minn., 184, 218 N.W., 892.

. . . .

The line between powers classified as governmental and those classified as proprietary is none too sharply drawn, and is subject to a change of front as society advances and conceptions of the functions of government are modified under its insistent demands. . . .

. . . *The true test is whether the contract itself deprives a governing body, or its successor, of a discretion which public policy demands should be left unimpaired.*

*Plant Food Co. v. Charlotte*, 214 N.C. 518, 519-20, 199 S.E. 712, 713 (1938) (emphasis added).

In *Improvement Co. v. Greensboro*, 247 N.C. 549, 101 S.E.2d 336 (1958), the Court stated that "[a] contract purporting to restrict the statutory discretion vested in the governing body of a municipality is *ultra vires* and to the extent of such limitation void and can of course furnish no right of action for noncompliance." *Id.* at 553, 101 S.E.2d at 339 (citations omitted).

In applying these principles to the instant case, we must determine whether enforcement of the 1928 resolution (assuming for this purpose that the City then had a valid power to annex) would deprive the City of a discretion which public policy demands should be left unimpaired. We conclude that the power to annex is such a discretionary power which must remain unfettered for the public good. The annexation power, like a municipality's power to lay out and maintain streets, to build bridges and to levy taxes, is

an exercise of a City's governmental discretion. It is a function which is exercised to promote the public good and cannot be performed by a private entity. Any attempt by the City to abridge this governmental power in 1928 was *ultra vires* and gives BASF no right of action for noncompliance.

We also find no merit in BASF's contention that the City should be equitably estopped from annexation. The doctrine of equitable estoppel should be applied to municipal corporations with caution and only in the rare case in which its application is required to prevent manifest injustice. 28 Am. Jur. 2d *Estoppel and Waiver* sec. 129 (1966). The doctrine is not to be applied to municipal corporations as freely as to private individuals or corporations, especially in matters entirely *ultra vires* to the municipality. Annot., 1 A.L.R.2d 338 (1948).

This is not a case in which manifest injustice will result from failure to apply equitable estoppel. There is no evidence that BASF had knowledge of the 1928 resolution or in any way relied on it when it purchased the facility in question in 1985. Further, the City's refusal to grant BASF what would in effect be a tax advantage over its neighbors does not work a manifest injustice requiring estoppel. *See* N.C. Constitution, Art. V, sec. 2(3).

[10] Next, BASF assigns as error the trial court's classification of two small portions of its 190-acre tract known as BASF West. BASF West is bisected by Hominy Creek. Petitioner contends that 17.7 acres along Hominy Creek should have been classified as vacant rather than as in industrial use. We disagree. The record supports the trial court's finding that a large part of the 17.7 acres consists of Hominy Creek and that BASF pumps water from the creek for industrial use and also discharges effluent into the creek. There are also pipes across the 17.7 acres which carry water from a reservoir outside the annexation area to the BASF plant. Another pipe transmits steam from the BASF plant area to its office area. These uses of the 17.7 acres are directly supportive of the plant's activity and the area was correctly classified as in industrial use. *Hook, supra.*

[11] Petitioner also excepts to the measurement and classification of a small area of BASF West found by the court to measure 3.85 acres and to be in industrial use. The court found that the area was leased to a farmer and under cultivation, but classified it as in industrial use. This was apparently based on the area's

**THRASH v. CITY OF ASHEVILLE**

[95 N.C. App. 457 (1989)]

small size in proportion to the 190 acres involved and the court's finding that the 3.85 acres is located between the BASF plant and Sand Hill Road which leads to the plant.

BASF first contends that according to its witness, an expert in land use planning, the area in question actually measures 6.2 acres. The City's expert, accepted by the court, was a registered land surveyor who testified that the area in cultivation was 3.7 acres. The two experts used essentially the same measurement technique, but petitioner's expert included a 2.5 acre buffer around the area actually cultivated. The court's finding of fact as to the size of the tract is supported by competent evidence. Therefore, it is binding on appeal even if there is some evidence to the contrary. *Huyck Corp., supra.* This finding is therefore upheld. It is therefore unnecessary for us to reach the question of use classification of this area. Even if the parcel should have been designated as vacant, rather than in industrial use, it would be of no help to petitioner since the tract would merely comprise another lot of five acres or less which under G.S. sec. 160A-48(c)(3) would actually improve the City's position.

## VIII

### USE OF NATURAL TOPOGRAPHIC FEATURES AND STREETS AS BOUNDARIES

Lastly, petitioners contend that the court erred in concluding that the City used natural topographic features and streets as boundaries whenever practical as required by G.S. sec. 160A-48(e). They also argue that the court erred in concluding that the description for the west annexation area was by metes and bounds as required by G.S. sec. 160A-49(e)(1). We are convinced from our review of the record that the City substantially complied with both of these requirements and petitioners' arguments do not merit discussion.

## IX

### CONCLUSION

For all the foregoing reasons we hold that the trial court correctly found and concluded that the respondent City of Asheville complied with the relevant statutory requirements for annexation.

Affirmed.

Judge COZORT concurs.

Judge GREENE dissents.

Judge GREENE dissenting.

While I agree with much in the majority opinion, nonetheless I disagree on several of what I consider to be dispositive issues.

I

*Owenby Property*

The Owenby Property (Property) is an 18.25 acre single tract of land which the City of Asheville (City) treated as subdivided into eighteen separate lots of five acres or less in size. Although the plat of the Property recorded in 1976 in the Buncombe County Register of Deeds Office showed a paper subdivision of eighteen lots, the entire 18.25 acre tract of property was last conveyed in 1984 with a metes and bounds description which did not refer to the recorded subdivision map. The record reveals that the Property had never been surveyed and divided on the ground, no lots had been sold, and no roads had been constructed and opened for traffic. The Buncombe County tax records showed the Property as eighteen separate lots.

The question presented is whether the City's classification of the Property is based on a method that is "calculated to provide reasonably accurate results." N.C.G.S. Sec. 160A-54 (1987). In my opinion, the City's classification of the Property as a 'subdivision' does not reflect the actual facts with reasonable accuracy and therefore is not 'calculated to provide reasonably accurate results.' Additionally, the Buncombe County Tax Office was not authorized by statute to appraise the Property as a 'subdivision' because the tract had not "been divided into lots that are located on streets laid out .and open for travel and that [had] been sold or offered for sale as lots . . ." N.C.G.S. Sec. 105-287(b)(4) (1985); *cf.* N.C.G.S Sec. 105-287(d) (Cum. Supp. 1988) ("A tract is considered subdivided into lots when the lots are located on streets laid out and open for travel and the lots have been sold or offered for sale as lots since the last appraisal of the property.").

Nonetheless, the City's classification of the Property, if based on a "reasonably reliable source" must be accepted by the reviewing court "unless the petitioners on appeal show that such estimates are in error in the amount of five percent (5%) or more." N.C.G.S. Sec. 160A-54(3) (1987). I believe that petitioners made this showing.

At trial, the City submitted that 64.9% of the "total acreage, not counting the acreage used at the time of annexation for commercial, industrial, governmental or institutional purposes," consisted of subdivided "lots and tracts five acres or less in size." The City maintained that this percentage included 441.8 acres consisting of "lots and tracts five acres or less in size" and a total of 680.4 acres "not counting the acreage used at the time of annexation for commercial, industrial, governmental or institutional purposes." The trial court determined that the City made several errors in classification of the properties and that these errors required an adjustment to reduce the percentage to 62.257%, including 434.66 acres consisting of "lots and tracts five acres or less in size" and a total of 698.17 acres "not counting the acreage used at the time of annexation for commercial, industrial, governmental or institutional purposes." The City does not now contest the trial court's property reclassifications and percentage reductions. Assuming, arguendo, that the Owenby Property was misclassified as subdivided property, subtraction of its 18.25 acres from the "lots and tracts five acres or less in size" decreases the relevant percentage to 59.643, just as it reduces to 416.41 the acreage in "lots and tracts five acres or less in size" of the 698.17 total acreage which the City submits is ripe for annexation. The new percentage of 59.643% represents a reduction in excess of five percent from the City's original calculations of 64.9%, and the City no longer complies with the 60% 'subdivision' requirement of Section 160A-48(c)(3).

II

*Enka-Candler Water and Sewer District*

A portion of the annexed area is in the Enka-Candler Water and Sewer District (District). The property owners in the District pay an increased ad valorem tax as a result of a one and a half million dollar ($1,500,000) bonded indebtedness which they incurred for the purposes of installing sewer lines in the District. At the time of the annexation, a large sum of the bonded indebtedness remained unpaid.

The petitioners argue that since the annexation ordinance provided no adjustment for the ad valorem taxes, the property owners in the District will be required to pay not only the same taxes as the property owners in the preexisting City limits but also the taxes assessed by the District. The City argues that tax relief will be provided to the property owners in the District consistent with N.C.G.S. Sec. 160A-49(f) (1987). "[P]roperty which is part of a *sanitary district* . . . shall not be subject to that part of the municipal taxes levied for debt service for the first five years after the effective date of the annexation." *Id.* (emphasis added). Section 160A-49(f) requires the municipality to provide certain tax relief to property owners in a "sanitary district" which the municipality annexes, but the statute is silent as to "water and sewer" districts. *Id.* The City contends that "sanitary" districts should be read to include "water and sewer" districts. I disagree. While Section 160A-49(f) does not define a "sanitary district," N.C.G.S. Sec. 130A-47 et seq. (1986) comprises its characteristics. Likewise, N.C.G.S. Sec. 162A-86 et seq. (1987) delineates a "water and sewer district." The statutory chapter and subpart authorizing the creation of the 'water and sewer' and 'sanitary' districts respectively empower these discrete districts with different authorities and denote methods of creation and operation that are substantially different. Through its legislative action, the General Assembly drew very clear distinctions between those terms. Accordingly, this court does not have the authority to substitute the term 'water and sewer' for the word 'sanitary' in Section 160A-49(f), as the City has suggested.

Because the General Assembly has not provided any statutory form of tax relief to the property owners in this 'water and sewer' District, the City is precluded from annexing this property unless it first adjusts the annexation ordinance. The annexation statutes provide that property of an annexed area "shall be entitled to the same privileges and benefits as other parts of such municipality[,]" Section 160A-49(f), and the property "in the newly annexed territory [shall be] subject to municipal taxes on the same basis as is the preexisting territory of the municipality." N.C.G.S. Sec. 160A-58.10(c) (1987). As the property owners in this District are subject to additional ad valorem taxes, the 'benefits' they receive from the City are not the 'same' as the 'benefits' received by property owners in the 'other parts of such municipality.' Furthermore, the taxes paid by the property owners in the District are not 'on the same basis as is the preexisting territory of the munici-

pality.' Consequently, the annexation of the properties in this District is inconsistent with these statutes and must fail. The fact that the City is currently negotiating with officials of the District regarding these taxes is immaterial to these proceedings in my opinion, since those negotiations should have been completed prior to the adoption of the annexation ordinance language.

III

Accordingly, I would reverse the order of the superior court approving the annexation ordinance and remand to the superior court for subsequent remand to the City for further proceedings.