IN THE MATTER OF THE ADOPTION OF P. E. P.

No. 8915SC1182

(Filed 4 September 1990)

1. **Adoption or Placement for Adoption § 23 (NCI4th) — adoption — not fraudulent**

   There was competent evidence to support each disputed finding relating to fraud arising from an adoption proceeding in which the biological mother, a resident of Michigan, arranged an adoption through The Way International, a religious organization, before the child was born; she came to North Carolina for the birth of the child and returned to Michigan afterwards; an interlocutory decree was entered on 17 November 1988; the biological mother filed [on 27 December 1988] a motion for relief from the interlocutory decree alleging fraud after seeing a television show on religious cults; and the trial judge found that she had willingly and voluntarily consented to the adoption of the child and that her consent was not procured by fraud.

   **Am Jur 2d, Adoption §§ 44, 47.**

2. **Adoption or Placement for Adoption § 23 (NCI4th) — adoption — fraud, undue influence, duress not present**

   The trial court's findings in an action for relief from an interlocutory adoption decree supported its conclusion that the birth mother's consent was not obtained by fraud, undue influence, or duress where the birth mother contended that she had been defrauded by the attorney for the adoptive parents in that he told her that she must be present in North Carolina to effectuate the adoption and that it was all right for him to pay or arrange payment for most of her expenses, and did not suggest that she seek independent legal counsel. The attorney's testimony at the hearing contested those allegations and, even if true, his conduct did not constitute fraud; the birth mother does not indicate that any of these factors induced her to consider placing her child for adoption; there was sufficient evidence to support the court's finding that she willingly and voluntarily consented to the adoption; and

IN RE ADOPTION OF P. E. P.

[100 N.C. App. 191 (1990)]

there was no evidence that she ever expressed dissatisfaction with any aspect of the adoption in North Carolina.

**Am Jur 2d, Adoption §§ 44, 47.**

3. **Evidence § 48.1 (NCI3d) — adoption — expert on cults — not qualified**

    The trial court did not abuse its discretion in an action for relief from an interlocutory adoption decree by refusing to accept an expert in the area of destructive cults and behavioral modification where plaintiffs made no effort to establish that the witness's purported area of expertise has received general acceptance in relevant academic or scientific communities or that it conformed to a generally accepted theory of specialized knowledge.

**Am Jur 2d, Expert and Opinion Evidence §§ 6, 55-59.**

4. **Adoption or Placement for Adoption § 3 (NCI4th) — adoption — best interest of child**

    The trial court did not err in an action for relief from an interlocutory adoption decree by concluding that it was in the best interest of the child to remain in the custody of the adoptive parents where the trial judge properly considered all of the pertinent circumstances and the uncontested findings alone adequately support the conclusion.

**Am Jur 2d, Adoption §§ 81, 82.**

5. **Adoption or Placement for Adoption § 3 (NCI4th) — adoption — no requirement that biological parents be unfit**

    The trial court did not err in an action for relief from an interlocutory adoption decree by finding that adoption was in the best interest of the child without finding that the biological parents were unfit or by refusing to admit testimony about The Way International. Plaintiffs offer no support for their argument that biological parents must be found unfit in order to reach the conclusion that adoption is in the best interest of the child, and the adoption statute and the case law make it clear that the trial court must be guided by a balancing of the interests resolved in favor of the best interest of the child. There was no basis on which the disputed testimony

**IN RE ADOPTION OF P. E. P.**

[100 N.C. App. 191 (1990)]

could have been admitted, and any error in excluding the evidence was harmless.

**Am Jur 2d, Adoption §§ 81, 82.**

6. **Adoption or Placement for Adoption § 26 (NCI4th) — adoption — biological father — failure to contest — estoppel**

The trial court did not err in an action seeking to set aside an interlocutory adoption decree by finding that the alleged biological father should be estopped from attacking the decree because he had actual notice of the proceedings and failed to take any action prior to the entry of the order. The findings clearly indicate that the court was not persuaded that Rowe was the father and, therefore, it is not clear that he had any rights under the adoption statute. Even if he was entitled to notice, his actual notice rendered the defect procedural and does not automatically require that the proceeding be set aside.

**Am Jur 2d, Adoption § 54.**

7. **Adoption or Placement for Adoption § 3 (NCI4th) — adoption — procedural irregularities — best interest of child**

Irregularities in an adoption proceeding did not require that an interlocutory adoption decree be dismissed where the defects in the proceeding were procedural. Procedural defects are among many factors to be considered, but the clear legislative policy of this state places the interests of the child above procedural defects. The bar is cautioned, however, that disregard of required procedures can result in dismissal of an adoption proceeding and that strict adherence to established procedures is always the better rule.

**Am Jur 2d, Adoption §§ 76, 82.**

Judge DUNCAN dissenting.

APPEAL by plaintiffs-intervenors from order entered 25 May 1989 in ORANGE County Superior Court by *Judge Craig B. Ellis.* Heard in the Court of Appeals on 3 May 1990.

*Coleman, Bernholz, Bernholz, Gledhill & Hargrave, by G. Nicholas Herman, for plaintiff-appellees.*

*Levine and Stewart, by Donna Ambler Davis, for defendant-appellants.*

IN RE ADOPTION OF P. E. P.

[100 N.C. App. 191 (1990)]

WELLS, Judge.

A petition for the adoption of the child PEP was instituted in Orange County and an interlocutory decree allowing the adoption by the PEPs was entered on 17 November 1988. On 27 December 1988, Pamela Rogers and William Rowe, plaintiffs-intervenors (plaintiffs hereinafter in this case), petitioned the court to have the interlocutory decree vacated and for the petition for adoption to be dismissed. Following a hearing on the Rogers-Rowe motion, on 25 May 1989 the trial court entered an order denying the Rogers-Rowe motion, affirmed the entry of the interlocutory decree, and remanded the matter to the Clerk for further proceedings in the adoption. Plaintiffs appealed.

Pamela Rogers is the biological mother of the infant PEP. William Rowe asserts that he is the child's biological father. In December 1987, PEP was conceived by Rogers who was then living in Michigan with Rowe, her daughter from a former marriage, and an infant son who was fathered by Rowe. Rogers and Rowe were experiencing financial and other difficulties during this period and in late May 1988, Rogers left Rowe and moved in with her mother. It was at this point that Rogers first contemplated giving up her unborn child for adoption and made preliminary contact with an adoption agency in Michigan.

When Sheryl Piccirillo, a friend of Rogers, learned that Rogers was considering placing her child up for adoption, Piccirillo suggested to Rogers that placement could be arranged through The Way International, a religious organization. A few days later, Doug Hargrave, an attorney from Orange County, North Carolina, flew to Michigan to meet with Rogers. This meeting, which took place 4 June 1988, was held to discuss the possible adoption of Rogers' unborn child by a couple in North Carolina. The couple, the PEPs, lived in Orange County, North Carolina. The PEPs had hired Hargrave to represent them in the adoption after being contacted by a representative of The Way International. The PEPs had been told by the representative that a woman in Michigan wanted to put her child up for adoption.

On 11 June 1988, a process server tried to serve Rogers with a summons in connection with a custody action being instituted by Rowe. Rogers called Hargrave and told him about the process server. Hargrave arranged for Rogers and her two children to

**IN RE ADOPTION OF P. E. P.**

[100 N.C. App. 191 (1990)]

fly to North Carolina on 12 June 1988. Rogers remained in North Carolina until September 14 or 15 of 1988.

After spending two days at the home of Hargrave, Rogers spent the remainder of her time in North Carolina in the home of Laura Smith, a nurse and acquaintance of Hargrave. Over the course of the summer, Smith was paid approximately $900 by Hargrave to cover room and board for Rogers and her two children. Rogers did not work while she was in North Carolina. Her financial needs, including any prenatal care and delivery expenses at North Carolina Memorial Hospital which were not covered by Medicaid, were met by Hargrave. Hargrave sometimes used his personal funds and sometimes used funds given him by the PEPs in order to effectuate the adoption. After Rogers returned to Michigan in September, Hargrave arranged for her to rent an apartment and paid for the first two months' rent.

While Rogers was in North Carolina her family did not know her exact whereabouts. In early August, Rogers allowed her daughter to return to Michigan in order to avoid a custody battle with her ex-husband. The airfare for this flight was also taken care of by Hargrave.

Rogers was interviewed by a social worker from the Orange County Department of Social Services on 29 August 1988. The same social worker interviewed the PEPs, both together and separately. The social worker visited the PEPs at home after the baby was placed with them.

After the birth of the child on 9 September 1988, Rogers returned to Michigan. An interlocutory decree was entered in the adoption on 17 November 1988. In late November or early December 1988, Rogers saw a television show which had as its theme destructive and religious cults. On the show, The Way International was portrayed as a cult. On 27 December 1988, Rogers filed her Motion for Relief From Interlocutory Decree on grounds that fraud had been committed upon her, and that she had signed the Consent to Adoption under undue influence and duress. Other facts appear in the opinion as necessary.

The order entered in this case contains sixty-two findings of fact and six conclusions of law. Plaintiffs except to thirteen of these findings and one conclusion. The findings of fact not excepted to are therefore binding on this court. *Harris v. Walden*, 314 N.C.

**IN RE ADOPTION OF P. E. P.**

[100 N.C. App. 191 (1990)]

284, 333 S.E.2d 254 (1985). When a judge sits without a jury it is presumed that the court disregards incompetent evidence, and if the court's findings are supported by competent evidence, they will be sustained. *Murchak Corp. v. Caldwell,* 301 N.C. 689, 273 S.E.2d 281 (1981).

In their first assignment of error plaintiffs contend that the trial court erred in finding that Rogers willingly and voluntarily consented to the adoption of her child and in concluding that her consent was not procured by fraud, undue influence or duress. Plaintiffs also assert that the trial court erred in finding that Rogers was aware that she could not revoke her consent to the adoption after the entry of the interlocutory decree and in finding that the decision to place the child with the PEPs was made after months of consideration, thought, and reflection. Finally, plaintiffs contend that the trial court erred in excluding testimony about The Way International, the religious organization to which Hargrave, the PEPs, Smith and Piccirillo belong and to which Rogers belonged at one time, and in sustaining an objection to testimony concerning who paid for an airline ticket for Rogers' daughter to fly back to Michigan in August 1988.

[1] Plaintiffs first contend that Rogers was "defrauded" into signing a consent form allowing defendants to adopt her child; therefore, the trial court's findings and conclusions to the contrary are erroneous.

Our appellate courts are bound by the trial court's findings of fact where there is some evidence to support those findings, even though the evidence *might* sustain findings to the contrary. *In re Montgomery,* 311 N.C. 100, 316 S.E.2d 246 (1984). (Emphasis ours.) In addition, N.C. Gen. Stat. § 48-11(a) in part provides that consent to adoption cannot be revoked after three months from the date of the giving of consent *or* after the entry of an interlocutory decree. Either the entry of an interlocutory decree or the passage of three months, whichever comes first, cuts off the time period for revoking consent. After the statutory period to revoke consent terminates, consent to adopt may only be revoked upon a showing of fraud in obtaining the consent. *See In re Shamp,* 82 N.C. App. 606, 347 S.E.2d 848 (1986).

Plaintiff specifically excepts to the following findings:

**IN RE ADOPTION OF P. E. P.**

[100 N.C. App. 191 (1990)]

52.

Pamela Rogers willingly and voluntarily consented to the adoption of the child by the [PEPs].

53.

That even though there was an error in the length of time set forth on the Consent to Adoption form, Rogers was aware upon the filing of the Interlocutory Decree that she could [not] revoke her consent.

54.

That the decision made by Pamela Rogers to place her child with the PEPs was not a hurried one, but was one made after months of consideration, thought and reflection.

Plaintiffs also excepted to the following conclusion by the court:

1. Pamela Rogers knowingly and voluntarily consented to the adoption of her child by Mr. W. PEP and Mrs. P. PEP, and there was no fraud, undue influence or duress by anyone to induce her to give her consent to the adoption.

Our review of the record shows that there is competent evidence to support each disputed finding. For example, Rogers testified at the hearing that she told Hargrave that it was fine with her for the PEPs to leave the hospital with the child; this was so noted by the trial court in an uncontested finding of fact. In addition, Jane Maskey, a social worker with Orange County DSS, testified that when she interviewed Rogers in August 1988, Rogers told her she was not being forced to place the child for adoption. Rogers also testified that it was in May 1988, after leaving Rowe, that she first told Piccirillo that she wanted to place the baby for adoption. After coming to North Carolina, Rogers repeatedly denied that she knew who was the father of her child. Rogers also testified that after returning to Michigan in September 1988, she contacted Hargrave's office several times regarding the progress of the adoption; however, the first time she raised the issue of not going through with the adoption was in November or December 1988, after seeing the television show on cults and after the interlocutory decree had been entered.

Also before the trial court was a consent to adoption form signed by Rogers and filed in Orange County on 13 September

IN RE ADOPTION OF P. E. P.

[100 N.C. App. 191 (1990)]

1988. The paragraph immediately above Rogers' signature contained the following language:

> I understand and agree that my Consent to Adoption may not be revoked after whichever of the following comes first: (1) entry or an interlocutory decree of final order of adoption, regardless of whether or not an interlocutory decree has been entered; or (2) three months from the giving of this Consent.

The phrase "three months" had been marked through and "30 days" inserted in its place. While the facts are in dispute as to whether the phrase "three months" was crossed out before or after Rogers signed the consent form, Rogers testified that she had read the consent form before signing it on 12 September 1988.

Because these findings are sufficiently supported by competent evidence we overrule this assignment of error.

[2]  We also hold that these findings, coupled with the uncontested findings, support the trial court's "conclusion" that Rogers' consent was not obtained by fraud, undue influence, or duress. Plaintiffs contend that Hargrave defrauded Rogers by: (1) telling her that she must be present in North Carolina in order to effectuate the adoption of her child in North Carolina; (2) telling her that it was alright for him to pay for, or arrange for payment of, most of her expenses while she was in North Carolina; and (3) failing to suggest that Rogers seek independent legal advice regarding the adoption since he was retained by the PEPs, whose interest might be in conflict with that of Rogers. Because of these alleged misrepresentations and failure to advise, Rogers contends that her consent to adoption was obtained by fraud. We disagree. First, Hargrave's testimony at the hearing contests these allegations. Secondly, even if plaintiffs' allegations are accepted as true, Hargrave's conduct, while questionable, and arguably in violation of N.C. Gen. Stat. § 48-37 (1984), did not constitute fraud in obtaining her consent. In addition, Rogers does not indicate that any of these factors induced her to consider placing her child for adoption. Indeed, Rogers' own testimony and behavior show the contrary. For example, it was Rogers who first raised the idea of adoption prior to ever having met Hargrave. After her initial meeting with Hargrave, it was Rogers who next contacted Hargrave after a process server appeared at her door.

IN RE ADOPTION OF P. E. P.

[100 N.C. App. 191 (1990)]

Plaintiffs' argument that Rogers was placed under duress and undue influence is similarly unpersuasive. While we agree with plaintiffs that it would have been preferable for Rogers to have interacted with a social worker from DSS on more than one occasion, this is not required by statute. There was sufficient evidence to support the trial court's finding that Rogers willingly and voluntarily consented to the adoption. There is no evidence in the record to the effect that while she was in North Carolina Rogers ever expressed dissatisfaction with any aspect of the adoption. This assignment is therefore overruled.

[3] In their next assignment of error plaintiffs contend that the trial court erred by refusing to accept Cynthia Kisser as an expert in the area of destructive cults and behavioral modification. We disagree. The competency of a witness to testify as an expert is within the sound discretion of the trial court, and its determination will not ordinarily be disturbed by a reviewing court. *Food Town Stores, Inc. v. City of Salisbury*, 300 N.C. 21, 265 S.E.2d 123 (1980). A finding that a witness is *not* qualified as an expert is not reversible error, unless there was abuse of discretion or the ruling was based on an erroneous view of the law. 1 *Brandis on North Carolina Evidence* § 133 (3d Ed. 1988). The witness gave her professional and academic background which included bachelors and masters degrees in American studies; her current position as executive director of The Cult Awareness Network, a national, nonprofit organization which acts as a clearinghouse for information on destructive cults; and a previous position as director of an agency that did research in the areas of mind control and destructive cults. Plaintiffs made no effort to establish that Ms. Kisser's purported area of expertise has received general acceptance in relevant academic or scientific communities or that it conformed to a generally accepted theory of specialized knowledge. Based on this record, we find that the court did not abuse its discretion in refusing to qualify Kisser as an expert in the area of destructive cults and mind control.

[4] Plaintiffs next assign as error the trial court's "conclusion of law" that it is in the best interest of the child to remain in the custody of the PEPs. The exception plaintiffs actually note in the record and reference in their brief is finding of fact number 62; however, because this finding is more properly labelled a conclusion of law and because the trial court also concluded that it would be in the best interest of the child to remain in the care, custody

IN RE ADOPTION OF P. E. P.

[100 N.C. App. 191 (1990)]

and control of the PEPs, we proceed to review whether the trial court's conclusion is supported by the findings in this case.

As in child custody and support cases, the trial court in an adoption case is given wide discretion. *See In re Spinks*, 32 N.C. App. 422, 232 S.E.2d 479 (1977). The trial court is in the best position to determine what is in the best interest of the child. *White v. White*, 90 N.C. App. 553, 369 S.E.2d 92 (1988). It is often a difficult determination and the trial court is in the best position to observe the parties and evaluate the evidence. *Id.; see also Wehlau v. Witek*, 75 N.C. App. 596, 331 S.E.2d 223 (1985). The determination as to what is in the best interest of the child should be made by weighing the totality of the circumstances. *Spinks, supra.*

As we have previously stated, findings of fact not challenged on appeal are presumed to be supported by competent evidence and are binding on this court. *Harris, supra.* Among the unchallenged findings in the present case are the following:

48.

Mr. [PEP] is employed . . . and makes $46,000 per year income.

49.

Mrs. [PEP] is a homemaker and stays at home with the child. The child is being well cared for by the [PEPs].

50.

The PEPs are fit and proper persons to have the care, custody and control of the minor child.

51.

Pamela Rogers and William Rowe have had a difficult relationship. Rogers decided to move from their joint residence and took their child, Benjamin, with her. Rowe tried to find her and tried to serve a summons on her in a court action. Rogers left Michigan to avoid the service of the summons and kept her whereabouts secret from him while she was in North Carolina. After she returned to Michigan, they engaged in a court action over Benjamin until they reached the aforementioned consent order.

These uncontested findings alone adequately support the trial court's conclusion that it was in the child's best interest to remain with

the PEPs. Our review of the trial court's findings and conclusions and of the transcript of the hearing persuades us that Judge Ellis properly considered all of the circumstances pertinent to reaching his conclusion that it was in the best interest of this child to remain in the custody of the PEPs. *See Spinks, supra.*

[5] In addition to their assertion that the conclusion was not supported by the evidence, plaintiffs also contend that the trial court erred in failing to find that Rogers and Rowe were unfit parents and by refusing to admit testimony about The Way International by Kisser and Rogers and Mr. PEP. We do not agree. First, plaintiffs offer no support for their argument that biological parents must be found unfit in order to reach the conclusion that an adoption is in the best interest of the child. Rather, the adoption statute, Chapter 48, and our case law precedents make it clear that while the trial court must be guided by a balancing of interests, these in turn must always be resolved in favor of what is in the best interest of the child under the circumstances of a particular case. Secondly, there was no basis on which Kisser's testimony could be admitted. The trial court had refused to qualify her as an expert. She had no other connection with any of the parties in this case beyond a telephone conversation with Rogers after the Cult Awareness Network's telephone number was flashed on the screen during the Geraldo Rivera show on cults and a brief meeting with Rogers the night before the hearing. Finally, the trial court's ruling on the admission of testimony by Rogers and Mr. PEP concerning practices of The Way International, even if error, was harmless in this context.

[6] Plaintiffs also assign as error the trial court's finding that Rowe should be estopped from attacking the interlocutory decree because he had actual notice of the proceedings and had failed to take any action prior to the entry of the order. Plaintiffs assert that failure to serve Rowe with notice of the adoption pursuant to N.C. Gen. Stat. § 1A-1, Rule 4 (1983) requires that the interlocutory decree be set aside and the adoption proceeding dismissed.

The trial court's findings clearly indicate that the court carefully considered the question of whether Rowe was the father of the child and that the court was not persuaded that he was the father. Under these circumstances it is not clear that Rowe had *any* rights under the adoption statute, including the right to notice. Even if he was entitled to notice pursuant to Rule 4, Rowe's actual

notice of the proceeding renders the defect procedural in nature and does not automatically require that the proceeding be set aside. This procedural defect aspect of this case must be resolved against plaintiffs consistently with the discussion and reasoning on plaintiffs' final assignment, next following.

[7]   In their final assignment of error plaintiffs contend that "irregularities" in this adoption proceeding require that the adoption petition be dismissed and the minor child returned to them. Plaintiffs specifically argue that the interlocutory decree should be dismissed for the following reasons: (1) Hargrave told Rogers that if she wanted to place the baby for adoption in North Carolina she would have to come to North Carolina when in fact there is no such requirement in Chapter 48. (2) Rowe never consented to the adoption. (3) At some point the time period on the consent to adoption form was altered from "90 days" to "30 days." (4) G.S. § 48-37, which addresses the prohibition against compensation for placing or arranging placement of a child for adoption, may have been violated.

This court has previously addressed the issue of procedural defects in an adoption proceeding. *See, e.g., In re Kasim,* 58 N.C. App. 36, 293 S.E.2d 247, *disc. rev. denied,* 306 N.C. 742, 295 S.E.2d 478 (1982) (trial court dismissed adoption proceeding after concluding that insufficient consent rendered the proceeding procedurally defective—reversed and remanded for determination of whether it was in best interest of the child to dismiss or continue the proceeding). Based on the language of G.S. § 48-1 and the discretion granted to the trial court by G.S. § 48-20(a) regarding the dismissal of an adoption proceeding, the court in *Kasim* concluded that the child's best interests should be paramount in the court's consideration of a motion to dismiss. Thus, in considering all the factors which might bear on the question of dismissal, procedural defects become one of many factors to be considered. All factors considered by the trial court should relate to the legislative policy stated in G.S. § 48-1:

(1) The primary purpose of this Chapter is to protect children from unnecessary separation from parents who might give them good homes and loving care, to protect them from adoption by person unfit to have the responsibility of their care and rearing, and to protect them from interference, long after they have become properly adjusted in their adoptive homes by

IN RE ADOPTION OF P. E. P.

[100 N.C. App. 191 (1990)]

biological parents who may have some legal claim because of a defect in the adoption procedure.

. . .

(3) When the interest of a child and those of an adult are in conflict, such conflict should be resolved in favor of the child; and to that end this Chapter should be liberally construed.

In making his conclusions the trial court in this case was properly guided by the clear legislative policy of this state which places the interests of the child above procedural defects. While we do not condone *any* procedural defects in adoption proceedings, we agree with the trial court that the best interest of the minor child comes before the interest of Rowe in procedural exactitude. The procedural defects present here, and any alleged unprotected rights that may exist in Rowe's favor, should be resolved in favor of the minor child. In this case such a resolution requires that the adoption proceeding be allowed to continue. We are aware of our Supreme Court's opinion in *In re The Adoption of Clark*, 327 N.C. 61, 393 S.E.2d 791 (1990), where the court held that an unwed biological father not be bound by an order terminating his parental rights. There, the father was not served with notice of the termination proceedings, nor was he aware of the proposed adoption of his child. Our facts are clearly distinguishable. In this case, plaintiff Rowe had actual notice of the adoption proceedings, but failed to timely act on that notice. We therefore affirm the order of the trial court. We nevertheless admonish members of the bar who attempt to arrange adoptions that strict adherence to established procedures always is the better rule. When pitted against the welfare of an innocent child, procedural defects may not always mandate dismissal of an adoption proceeding; however, disregard of required procedures can result in dismissal of an adoption proceeding, with possible tragic consequences.

Affirmed.

Judge PARKER concurs.

Judge DUNCAN dissents.

**IN RE ADOPTION OF P. E. P.**

[100 N.C. App. 191 (1990)]

Judge DUNCAN dissenting.

I

The Legislature cannot have intended that our adoption laws would permit this result. I recognize that a trial judge, who hears the testimony and observes the witnesses, is the person best able to find the facts of a case. When competent evidence supports those findings, moreover, they properly bind an appellate court, whose view of the case is limited to the cold record. Judge Ellis deserves commendation for his patient and thorough consideration of the fiercely conflicting evidence presented to him at trial. I cannot, however, agree with the conclusion he reached, and I cannot concur with the conclusion reached by the majority on appeal. In its best light, the record in this case shows a consistent and apparently deliberate failure to adhere to the laws of this State, a failure the courts should not sanction by any remote implication. By upholding this adoption, we necessarily reward a circumvention of the law, and, from that, I dissent.

One cannot look at any aspect of this case and come away untroubled. At the very least, there is a flagrant statutory violation. N.C. Gen. Stat. § 48-37 (1984) flatly declares that "No person . . . shall offer or give . . . compensation, consideration, or thing of value for receiving or placing, arranging the placement of, or assisting in placing or arranging the placement of, any child for adoption." The majority states that—so long as Rogers' allegations are accepted as true—Hargrave's conduct "arguably" violated this statute. To the contrary, I believe it is *inarguable* upon the facts as found by the *judge* that § 48-37 was violated.

Hargrave's dealings with Rogers began with his purchase of airline tickets to enable her to leave Michigan a step ahead of a process server and ended, following the birth and relinquishment of her child, with his giving her $1,500.00. (The one clearly erroneous finding in the record involved this last payment, which the trial judge thought to be for a lease, but which—as defendants' counsel conceded at oral argument—was given Rogers *in addition to* the lease money.) While she was in North Carolina, Hargrave paid for Rogers' room and board, gave her expense money, and paid part of her physician's fees. Throughout all this, Hargrave was the attorney for the PEPs. The facts are disputed about who isolated Rogers from her family, but it is undisputed that she

**IN RE ADOPTION OF P. E. P.**

[100 N.C. App. 191 (1990)]

was not in contact with them while here and that, during this period, Hargrave paid her bills. His contention that he did so out of love for someone he hardly knew is inherently incredible. Hargrave's munificence was either an instance of the kindness of strangers, or it was consideration for the child his clients adopted.

Standing alone, such a violation would prove troubling. But it does not stand alone. At virtually every turn, there are examples of proper procedure being bypassed so as to "speed things along." The time period for revocation of consent was shortened on the consent form to 30 days. Rogers' meeting with social worker Jane Maskey of the Orange County DSS took place while Rogers was experiencing contractions and was in physical discomfort. Maskey testified that because of Rogers' condition, she (Maskey) "didn't think it was the appropriate time to give [Rogers] counselling or anything else." Following the child's birth, the PEPs were allowed to leave North Carolina Memorial Hospital with the child in their custody. Gloria Rentrope, a clinical social worker with the hospital, testified that such a release is not in accord with normal hospital procedure and that it was a deviation she has allowed only three or four times during her twelve years there.

These procedural transgressions were further compounded. The majority holds that the question of notice is moot because Rowe had actual knowledge of the adoption. The notice issue, however, is noteworthy for another reason. According to Jane Maskey, when, as happened here, the director of Social Services is named as a child's guardian for purposes of consent to an adoption, notice by publication is given in the county where the child was conceived. No one contends that PEP was conceived in Orange County, North Carolina, yet that is where Hargrave published notice. The consequence of this procedural glitch was anything but harmless. In Maskey's view, DSS "would have said we don't want the interlocutory entered until we give this person in Michigan a chance to come forward if he's going to come forward; and we wouldn't have expected him to come forward [if notice were given] in Orange County."

Maskey testified that, had DSS been aware of them, the irregularities in this case would have resulted in the interlocutory's not being entered prior to the expiration of 90 days from the birth of the child. Well within this 90-day period, Rogers filed her Motion for Relief From Interlocutory Decree. In short, had proper procedure—including proper notice procedure—been followed,

Rogers would have been afforded adequate time to revoke her consent, and would have done so within the allowable period.

I agree that procedural defects should not outweigh the best interests of the child. The procedural irregularities in this case, however, seem purposeful, and designed to facilitate — as indeed happened — a "quick" and irrevocable adoption. Rogers may not be the victim of fraud, and any single procedural aberration, looked at in isolation, may not appear to be sufficient to void the adoption. When *viewed together*, however, the defects in this case are substantial and serious enough that we set a dangerous precedent by holding that this adoption may stand in spite of them. For public-policy reasons, to say to future parties that the courts of North Carolina will not endorse conduct that suggests a child was purchased, I would reverse the order of the trial judge. The majority's warning of tragic consequences comes, in this case, too late.

II

At the very least, I would remand this case for additional findings.

First, I believe the judge erred by excluding the testimony of Cynthia Kisser as to the alleged behavioral-modification practices of The Way International. The judge sustained defendants' objection that Kisser's expertise did not conform to an area of generally accepted explanatory theory and that her testimony was not relevant. The majority holds that the judge ruled correctly because "plaintiffs made no effort to establish that Ms. Kisser's purported area of expertise has received general acceptance in relevant academic or scientific communities . . . ." However,

> [e]xpert testimony is properly admissible when it can assist the [trier of fact] in drawing certain inferences from facts and the expert is better qualified than the [trier of fact] to draw such inferences. It is not necessary that an expert be experienced with the identical subject matter at issue or be a specialist, licensed, or even engaged in a specific profession. This Court has not adhered exclusively to the view that expert testimony must be based upon 'generally accepted' scientific methods. It is enough that the expert witness 'because of his expertise is in a better position to have an opinion on the subject than is the trier of fact.'

## STATE v. ROSS

[100 N.C. App. 207 (1990)]

*State v. Evangelista*, 319 N.C. 152, 163-64, 353 S.E.2d 375, 383-84 (1987) (citations omitted). It is the reliability of the scientific method, and not its popularity within a scientific community, that is the relevant focus. *State v. Bullard*, 312 N.C. 129, 149, 322 S.E.2d 370, 381-82 (1984). The judge, of course, enjoys "wide latitude of discretion" when deciding whether to allow expert testimony. *Evangelista*, 319 N.C. at 164, 353 S.E.2d at 384. That discretion, however, must be exercised in light of the correct standard. Accordingly, I would remand for a proper finding as to Kisser's qualifications and, if she is found to be qualified, for additional findings of fact that include a consideration of her testimony.

Second, I respectfully disagree with the majority that the exclusion of evidence about the practices of The Way International was "harmless in th[e] context" of determining PEP's best interests. In determining a child's best interests, the judge may properly consider the parents' religious beliefs and practices. *Cf. In re Custody of King*, 11 N.C. App. 418, 419, 181 S.E.2d 221, 221 (1971) (in finding changed circumstances, trial judge entered finding that mother participated in local church activities); *see Rogers v. Rogers*, 490 So.2d 1017, 1019 (Fla. Dist. Ct. App. 1986) (adopting holding of Alabama Supreme Court that beliefs and practices may be considered as factor in custody determination, but award of custody may not be conditioned on restriction of parent's First Amendment rights); *see generally* Annotation, *Religion as Factor in Child Custody and Visitation Cases*, 22 A.L.R.4th 971 (1983). In this case, every relevant factor should have been considered, and I would not hold that the failure to do so was harmless.