IN THE MATTER OF THE ADOPTION OF P.E.P.

No. 509A90

(Filed 5 September 1991)

**1. Adoption or Placement for Adoption § 2 (NCI4th) — payment of natural mother's expenses — statutory violation**

The intent of N.C.G.S. § 48-37 is to prevent the buying and selling of babies. This statute is violated if the adopting parents and their attorney make funds available to bring the biological mother into the state for the purpose of facilitating an adoption, to support the mother through the date of birth, and to return the mother to her home state.

**Am Jur 2d, Adoption § 13.**

**2. Adoption or Placement for Adoption § 2 (NCI4th) — payment of natural mother's expenses — statutory violation**

Adopting parents and their attorney violated N.C.G.S. § 48-37 where the attorney used his own funds and funds given to him by the adopting parents in the following manner: he paid transportation expenses of $379 for the mother and her two children to come to North Carolina; he paid $300 per month for food and shelter for the mother and her children while they were in North Carolina; he gave the mother approximately $35 per week for three months; he provided the mother with transportation while she was in North Carolina; he hired and paid a $500 retainer fee for a Michigan lawyer to help the mother in two lawsuits pending in Michigan; he paid $300 for an airplane ticket for one of the children to return to Michigan; he paid some of the mother's medical expenses; he paid $3,266 for a six-month lease for an apartment for the mother when she returned to Michigan; he paid $279 for the mother's flight back to Michigan; and he sent the mother $1,500 once she returned to Michigan.

**Am Jur 2d, Adoption § 13.**

**3. Adoption or Placement for Adoption § 43 (NCI4th) — statutory violations and other irregularities — interlocutory decree set aside**

Statutory violations, together with other irregularities, require that an interlocutory adoption decree be set aside and that the adoption proceeding be dismissed where the adopt-

## IN RE ADOPTION OF P.E.P.

[329 N.C. 692 (1991)]

ing parents and their attorney violated N.C.G.S. § 48-37 by providing the mother with complete financial support prior to and immediately after the birth of the child; the attorney erroneously advised the out-of-state expectant mother that she needed to be in the same state as the adopting parents if the adoption was to take place when he knew or should have known that N.C.G.S. § 48-3 permits adoption irrespective of the place of birth or residence of the child; the attorney failed to serve the putative father with legal notice in Michigan after learning that he was asserting that he was the father of the unborn child, and the publication of notice to the putative father in an Orange County, North Carolina newspaper was inadequate notice under N.C.G.S. § 1A-1, Rule 4(j1); and it is unlikely that social services personnel would have suggested issuance of the interlocutory decree prior to the expiration of the normal 90-day period for revocation of consent to adoption if they had known that there was a claim by an out-of-state putative father, and the mother's attempted withdrawal of her consent to adoption within the 90-day period would have been timely.

**Am Jur 2d, Adoption §§ 26, 46, 50, 51.**

**Comment Note—Right of natural parent to withdraw valid consent to adoption of child. 74 ALR3d 421.**

**Necessity of securing consent of parents of illegitimate child to its adoption. 51 ALR2d 497.**

Justice WEBB dissenting.

APPEAL by plaintiffs pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 100 N.C. App. 191, 395 S.E.2d 133 (1990), affirming a judgment entered 25 May 1989 by *Ellis, J.,* in Superior Court, ORANGE County. Heard in the Supreme Court 13 March 1991.

*Levine and Stewart, by Donna Ambler Davis, for appellants.*

*Coleman, Bernholz, Bernholz, Gledhill & Hargrave, by G. Nicholas Herman, for appellees.*

*Heidi G. Chapman, for North Carolina Association of Women Attorneys, amicus curiae.*

IN RE ADOPTION OF P.E.P.

[329 N.C. 692 (1991)]

FRYE, Justice.

We are again faced with making a difficult decision concerning the adoption of a newborn child. This action involves the natural parents' attempt to set aside an Interlocutory Decree of Adoption, to prevent the entry of a Final Order of Adoption, to dismiss the Petition for Adoption, and to regain custody of their son, P.E.P. The trial judge denied all relief, and the Court of Appeals affirmed with one judge dissenting.

Procedurally the case arose in the following manner. On 13 September 1988, defendants, Mr. and Mrs. PEP (the PEPs), filed a Petition for Adoption in the Superior Court, Orange County. On 17 November 1988, an interlocutory decree allowing the adoption by the defendants was entered. On 27 December 1988, the plaintiffs, Pamela Rogers (Rogers) and William Rowe (Rowe), filed and served a notice of motion for relief from the interlocutory decree, pursuant to N.C.R. Civ. P. 60(b)(6), together with supporting affidavits, on the grounds of insufficiency of process, fraud, undue influence, and duress. Following action by the clerk of superior court as to various matters, the entire action was removed from the clerk and placed on the superior court trial calendar.

On 8 May 1989, plaintiffs filed and served a notice of amended motion and an amended motion for relief from the interlocutory decree pursuant to Rule 15(a) and Rule 24(a) of the North Carolina Rules of Civil Procedure. On the same day, defendants filed and served a motion for hearings to be closed and for change in caption, a motion in limine, and a response to plaintiffs' Rule 60(b)(6) motion. The motion for hearings to be closed and for change in caption was granted and the plaintiffs' amendment to their Rule 60(b)(6) motion was allowed. Plaintiffs were also permitted to intervene in the adoption proceeding and to request relief from the interlocutory decree. The hearing was held before Judge Ellis.

On 25 May 1989, Judge Ellis entered the final order of the trial court, denying plaintiffs' motion for relief from the interlocutory decree, and plaintiffs appealed. The Court of Appeals affirmed the trial court's judgment. Judge Duncan dissented, and plaintiffs appealed to this Court as a matter of right based on the dissenting opinion. *In the Matter of the Adoption of P.E.P.*, 100 N.C. App. 191, 395 S.E.2d 133 (1990).

IN RE ADOPTION OF P.E.P.

[329 N.C. 692 (1991)]

The evidence presented by the plaintiffs at the hearing before Judge Ellis tended to show that Rogers and Rowe are the biological parents of P.E.P. P.E.P. was conceived in December of 1987, while Rogers was living with Rowe in Michigan. Rogers and Rowe were not married to each other at the time of P.E.P.'s conception or birth.

In late 1987, Rogers became friends with Sheryl Piccirillo (Piccirillo), and Piccirillo introduced Rogers to an organization known as "The Way International" (the Way). In February of 1988, Rogers began working with Piccirillo cleaning houses and began spending most of her time with Piccirillo. Rogers soon became distanced from persons who did not believe in the Way. She no longer saw her former friends and did not spend much time with her mother.

Piccirillo convinced Rogers that Rowe was cheating on her and that he was questioning whether he was the father of her unborn child. On 28 May 1988, Rogers moved from Rowe's house and moved in with her mother. She did not leave any information with Rowe as to where she had moved. Rowe called Rogers' mother, Rogers' ex-husband, and Piccirillo trying to find out where Rogers was living, but no one would give him any information. On 31 May 1988, Rowe contacted an attorney in Michigan, Richard Spruit (Spruit), and arranged to meet with him three days later to try to find Rogers. Rowe soon found out that Rogers was at her mother's house because on one occasion when he telephoned Rogers' mother, Rogers answered the telephone.

After leaving Rowe, Rogers contemplated placing P.E.P. for adoption. Rogers discussed the possibility of adoption with Piccirillo, and Piccirillo told Rogers that the Way had a lot of people who would like to adopt a child. Piccirillo called a member of the Way to let him know of the possible adoption and that person contacted the PEPs who lived in North Carolina. The PEPs then employed an attorney, Douglas Hargrave (Hargrave), a follower of the Way living in Hillsborough, North Carolina, to handle the possible adoption. The PEPs agreed to pay Hargrave $3,500 to assist them in the adoption proceeding. Hargrave called Piccirillo and told her that he wanted to meet with Rogers.

Hargrave flew to Michigan and met with Rogers and Piccirillo on 4 June 1988. During this meeting, according to Rogers, Hargrave took Rogers and Piccirillo to lunch and told Rogers that "[she] had to be in the same state as the adoptive parents" if she was going to place her child for adoption. Hargrave testified that he

IN RE ADOPTION OF P.E.P.

[329· N.C. 692 (1991)]

"told [Rogers] if she wanted to place the baby in North Carolina, I figured she'd have to come to North Carolina." Rogers also testified that she informed Hargrave during the meeting that Rowe was the father of her unborn child. Hargrave testified that Rogers did tell him that she had been living with Rowe, but when he asked her if Rowe was the baby's father, "she just really didn't really want to talk about that and sort of lowered her voice and said no."

One week later, on 11 June 1988, a process server tried to serve a summons on Rogers at her mother's house. Rogers testified that she called Hargrave and told him about the process server, and Hargrave arranged and paid for Rogers and her two children to fly to North Carolina the next day. However, according to Hargrave's testimony, he arranged and paid for Rogers' transportation to North Carolina, not to help her avoid the process server, but because she wanted to leave Michigan before her family and friends found out about her pregnancy. Rogers also testified that at the time the trip was arranged, she had no intention of remaining in North Carolina.

On 12 June 1988, Hargrave met Rogers and her children at the Raleigh-Durham Airport and took them to his house where they remained for two days. On their third day in North Carolina, Hargrave arranged for Rogers and her children to move in with Laura Smith (Smith), another follower of the Way. Rogers lived with Smith until after the baby was born and never paid for her accommodations. Hargrave testified that he used his personal funds and funds from the PEPs to pay Smith and to provide funds for Rogers.

Rogers testified that no one in her family knew where she was while she was in North Carolina. However, her mother had Hargrave's telephone number and address in case she wanted to contact Rogers. While staying in North Carolina, Rogers' days were spent only with followers of the Way. She would read books from the Way given to her by Smith, and Smith would play the Way's teaching tapes and music tapes every day. Smith also discussed the philosophy of the Way with Rogers.

In early August 1988, Rogers' ex-husband threatened to bring a custody suit against Rogers because she had taken their daughter, Crystal, out of Michigan and he was unable to visit with his child. Hargrave retained Nanna Carpenter (Carpenter), a lawyer in

## IN RE ADOPTION OF P.E.P.

[329 N.C. 692 (1991)]

Michigan, to handle the matter for Rogers. Hargrave paid Carpenter's $500 retainer out of his personal funds, and he was not reimbursed. Crystal was sent back to Michigan before the birth of P.E.P.; Hargrave paid her airfare, and Mr. PEP reimbursed him.

On 29 August 1988, Rogers met with Jane Maskey (Maskey), a social worker for the Orange County Department of Social Services. Maskey had handled adoptions exclusively for the last fourteen years. Hargrave's office had arranged the meeting, and prior to the interview with Maskey, according to Rogers, Hargrave counseled her on what to say. Maskey was allowed to testify at trial as an expert in adoption procedures in North Carolina. Maskey testified that when she met with Rogers she told her that "it's illegal for any money to change hands with a private adoption. I asked her how she was supporting herself; and she said that her family was helping her to support herself." Maskey also testified that the interview was approximately thirty-five minutes, shorter than her usual interviews because Rogers "was having contractions and she was uncomfortable. And I didn't think it was the appropriate time to give counseling or anything else."

Rogers had not met the PEPs prior to the birth of her child. Hargrave told Rogers that she could meet the adoptive parents, but he advised against meeting them. Hargrave also did not permit Rogers to attend the local Twig meetings, the weekly gatherings of the local followers of the Way, because the PEPs attended the meetings. The PEPs had been involved with the Way since 1974.

Hargrave transported Rogers to the hospital, and P.E.P. was born on 9 September 1988, at North Carolina Memorial Hospital (Hospital) in Chapel Hill. On 10 September 1988, a nurse brought P.E.P. to Rogers, and according to Rogers, she "only spent about two minutes with [the baby] because I felt like [Hargrave] was mad at me; and I did not want him mad at me." Rogers signed a release form prepared by Hargrave and left the Hospital. A nurse delivered the baby to the PEPs. Rogers testified that Hargrave had told her that "it was his experience that the mother should not see the child because it's too hard on the mother; and you should only stay in the hospital like a day because it's best just to go home and start your life again."

On 12 September 1988, Janet Dutton (Dutton), a member of Hargrave's law firm, met with Rogers because someone from the Hospital had called Hargrave's office and stated that Rogers did

IN RE ADOPTION OF P.E.P.

[329 N.C. 692 (1991)]

not complete the proper procedure when she left the Hospital on 10 September. The birth certificate had not been signed, and Rogers had not met with a hospital case worker. Rogers returned to the Hospital with Dutton, signed the birth certificate, and met with Gloria Rentrope (Rentrope), a case worker for the Hospital. Rentrope testified that she deviated from hospital procedure and authorized the release of P.E.P. to the adoptive parents at the Hospital on 10 September because of Hargrave's special arrangements with the Hospital's legal department. On 12 September, Rentrope talked with Rogers for fifteen or twenty minutes about the trauma and process of giving up a baby for adoption. Rentrope testified she felt uncomfortable about the short period of time that she had to talk with Rogers and the fact that her first interview with Rogers was after the baby had been delivered to the adopting parents.

Following Rogers' meeting with Rentrope, Rogers and her son, Benjamin Rowe, flew back to Michigan on the same day. Hargrave paid the airfare. Two or three weeks after Rogers returned to Michigan, she told Piccirillo that she wanted her baby back. Rogers had received a notice that Spruit, Rowe's attorney, had scheduled depositions of Rogers to try to find the baby. Rogers then made airline reservations to return to North Carolina. On the day that she was to leave for North Carolina, Piccirillo and her husband went over to Rogers' apartment and called Hargrave. Rogers and Hargrave talked on the telephone for at least an hour. According to Rogers, Hargrave and Piccirillo assured her "that something would happen to [Rowe]" if he continued to search for the baby. After talking with Hargrave, Rogers decided not to return to North Carolina.

On 27 September 1988, Hargrave wrote a letter to Spruit stating that he was aware that Rowe was asserting that he was the father of P.E.P. In the letter, Hargrave asked whether Spruit would accept service on behalf of Rowe of the notice of the filing of a petition for adoption. On 4 October 1988, Spruit sent a letter to Hargrave stating, "As of the present time, [Rowe] is certain that he is the father of this child, and he will not voluntarily consent to the adoption." Spruit did not accept service on behalf of Rowe, and Hargrave did not have Rowe personally served or served by certified mail with notice of the adoption proceeding.

On 5, 12, and 19 October 1988, Hargrave caused to be published a Notice of Service of Process by Publication in *The News of*

IN RE ADOPTION OF P.E.P.

[329 N.C. 692 (1991)]

*Orange County*, a Hillsborough, North Carolina, newspaper. On 15 November 1988, Hargrave signed and filed an Affidavit of Service of Process by Publication in Orange County Superior Court. The affidavit stated that "the natural father of [the child] after due diligence cannot be served within this state in the manner prescribed in Rule 4J of the North Carolina Rules of Civil Procedure."

In late November or early December 1988, Rogers was at Piccirillo's house watching the "Geraldo Rivera Show." The theme of the show was religious and dangerous cults, and the Way was portrayed on the show as being a dangerous cult. Rogers became frightened and confused, and she went home and called the cult awareness hotline telephone number that was given on the show. According to Rogers, the guests on the television show stated that followers of the Way were trained to bear arms and to deal in mind control.

Rogers testified that she called Hargrave the day after the television show to ascertain the status of the adoption and told him that she wanted to stop the adoption. Rogers then called the Orange County Clerk's Office and was informed that the interlocutory decree had been entered on 17 November 1988. On 27 December 1988, Rogers and Rowe filed a motion for relief from the interlocutory decree on grounds that fraud had been committed upon her and that she had signed the consent to adoption under undue influence and duress. Other facts will be addressed as necessary.

The issue presented in this case is whether the violation of N.C.G.S. § 48-37 by the adoptive parents and their attorney, together with the numerous other irregularities in this case, makes the adoption proceeding invalid.

In his final order on 25 May 1989, Judge Ellis made sixty-two findings of fact, and plaintiffs excepted to fifteen of them. We will address finding of fact 59. The trial judge found as follows:

(59) There have been defects in the adoption procedures in that Rogers was provided by the [PEPs] and Hargrave with funds for her transportation to North Carolina from Michigan, and from North Carolina back to Michigan, for her support while she was in North Carolina, and with money for an apartment in Michigan after the birth of the child. Rogers willingly

accepted this support. The child was not placed for adoption in order to receive this support or any other compensation.

There was plenary evidence to support finding of fact No. 59.

N.C.G.S. § 48-37[1] provides in pertinent part:

> No person, agency, association, corporation, institution, society or other organization . . . shall offer or give, charge or accept any fee, compensation, consideration or thing of value for receiving or placing, arranging the placement of, or assisting in placing or arranging the placement of, any child for adoption
> . . . .

There are no North Carolina cases which interpret N.C.G.S. § 48-37; however on 5 August 1975, an Attorney General's opinion, reported at 45 N.C.A.G. 24, clearly expressed the view that N.C.G.S. § 48-37 is intended to govern situations such as the one we are now faced with in the present case. In the Attorney General's opinion, the Director of the Department of Social Services asked:

> Under Chapter 335 of the 1975 Session Laws, effective July 1, 1975, prohibiting the buying and selling of children for adoption, may prospective adoptive parents pay the transportation expenses to North Carolina as well as all medical costs incident to the birth of the child of an expectant mother residing in another state who is considering placing her baby for adoption with this couple?

The Attorney General responded:

> In our opinion the type of arrangement contemplated in this case is clearly violative of the provisions of Section 1 of Chapter 335. Is there any real doubt that the prospective adoptive parents are offering or giving compensation, consideration or a thing of value to the expectant mother for receiving her child for adoption? We think not.

45 N.C.A.G. 24 (1975).

---

1. We note that the General Assembly amended N.C.G.S. § 48-37 to provide that the adoptive parents may pay the reasonable and actual medical expenses incurred by the biological mother incident to the birth of the child provided that the adoptive parents disclose in the petition for adoption the amount of such payments and represent that there were no gifts or payments or promises to give anything of value such as is prohibited by this section. 1991 N.C. Sess. Laws ch. 335. This amendment does not apply to this case.

## IN RE ADOPTION OF P.E.P.

[329 N.C. 692 (1991)]

[1] The legislative intent of N.C.G.S. § 48-37 is to prevent the buying and selling of babies. In finding of fact 59, the trial judge found that the child was not placed for adoption in order to receive the support provided by the adopting parents and their attorney or any other compensation. In finding that the child was not placed for adoption in order to receive the support, the trial judge placed emphasis solely on the motive of the biological mother. However, emphasis should also be placed on the motives of the adopting parents and their attorney. If the adopting parents and their attorney, as here, make the funds available for the purpose of bringing the biological mother into the state for the purpose of facilitating the adoption, including supporting her and the child through the date of birth and returning the mother to her home state, then such actions constitute a violation of the statute. As stated by the Attorney General's opinion, "Is there any doubt that the prospective adopting parents are offering or giving compensation, consideration or a thing of value to the expectant mother for receiving her child for adoption? We think not." Hargrave and the PEPs violated N.C.G.S. § 48-37 by providing Rogers with complete financial support prior to and immediately after the birth of P.E.P.

[2] There was evidence which showed that Hargrave paid for the transportation of Rogers and her two children to North Carolina which amounted to $379; that he paid $300 per month for food and shelter for Rogers and her children while they were in North Carolina; that he gave Rogers approximately $35 per week for three months; that he provided Rogers with transportation while she was in North Carolina; that he hired and paid a $500 retainer fee for a Michigan lawyer to help Rogers in two lawsuits pending in Michigan; that he paid approximately $300 for an airplane ticket so that Rogers' daughter could return to Michigan before the birth of P.E.P.; that he paid some of Rogers' medical expenses; that he paid $3,266 for a six-month lease for an apartment for Rogers when she returned to Michigan; that he paid $279 for Rogers' flight back to Michigan; and that he sent Rogers $1,500 once she returned to Michigan. Hargrave admitted that he used his personal money and funds given to him by the PEPs to take care of Rogers' expenses.

[3] Although Hargrave or the PEPs may not have purchased Rogers' unborn child, the evidence would support an inference that this was done. Rogers became totally financially dependent on Hargrave after moving to North Carolina. There is substantial

evidence that Rogers received over $7,000 from Hargrave and the PEPs during and immediately following her pregnancy. Thus, we conclude that the actions of the adopting parents, through their attorney, contributed to a defective adoption proceeding.

In addition to the violation of N.C.G.S. § 48-37, there is also evidence which shows that other adoption statutes were either ignored or violated. For example, evidence was presented which showed that Hargrave suggested to Rogers that she needed to be in the same state as the adoptive parents if the adoption was to take place. Plaintiffs contend that the sole purpose of removing Rogers from Michigan was to seclude her from Rowe, her family, and her friends, and to make her totally dependent upon the support of Hargrave and the PEPs, thereby clouding Rogers' opportunity and ability to clearly contemplate and voluntarily decide whether to place her child for adoption. N.C.G.S. § 48-3 provides, "Any minor child, irrespective of place of birth or place of residence, and whether or not a citizen of the United States, may be adopted in accordance with the provisions of this Chapter." N.C.G.S. § 48-3 (1984 & Cum. Supp. 1990). Regardless of Hargrave's motive for advising Rogers to move to North Carolina, the relevant statute makes it clear that a birth mother does not have to give birth to her child in the state in which the adoptive parents reside. As an attorney handling a private placement adoption, Hargrave knew or should have known of this statute, prior to advising an out-of-state expectant mother to move to North Carolina.

The evidence also shows that Hargrave did not follow the North Carolina Rules of Civil Procedure. For example, Hargrave failed to serve Rowe with legal notice in Michigan after finding out that Rowe was asserting he was the father of Rogers' unborn child. Instead, Hargrave attempted to provide Rowe with notice of the pending adoption proceeding by publishing a legal notice in a local Orange County, North Carolina, newspaper. N.C.G.S. § 1A-1, Rule 4(j1), provides in pertinent part:

> A party that cannot with due diligence be served by personal delivery or registered or certified mail may be served by publication . . . . [S]ervice of process by publication shall consist of publishing a notice of service of process by publication once a week for three successive weeks in a newspaper that is qualified for legal advertising . . . and circulated in the area where the party to be served is believed by the serving party to be located . . . .

## IN RE ADOPTION OF P.E.P.

[329 N.C. 692 (1991)]

N.C.G.S. § 1A-1, Rule 4(j1) (1990). Hargrave knew that Rowe resided in Michigan, not in North Carolina; therefore, the publication of notice in an Orange County, North Carolina, newspaper was inadequate notice under the statute. This was not a mere technicality — had social services personnel known that there was a claim by an out-of-state putative father, it is unlikely that they would have suggested issuance of the interlocutory decree prior to the expiration of the normal 90-day period for revocation of the consent to adoption. Thus, the mother's attempted withdrawal of her consent to adoption within the 90-day period after signing the consent and prior to the issuance of the interlocutory decree would have been timely.

In Judge Duncan's dissent, she stated:

In its best light, the record in this case shows a consistent and apparently deliberate failure to adhere to the laws of this State, a failure the courts should not sanction by any remote implication. By upholding this adoption, we necessarily reward a circumvention of the law, and, from that, I dissent.

. . . .

I agree that procedural defects should not outweigh the best interests of the child. The procedural irregularities in this case, however, seem purposeful, and designed to facilitate — as indeed happened — a "quick" and irrevocable adoption. Rogers may not be the victim of fraud, and any single procedural aberration, looked at in isolation, may not appear to be sufficient to void the adoption. When *viewed together*, however, the defects in this case are substantial and serious enough that we set a dangerous precedent by holding that this adoption may stand in spite of them. For public-policy reasons, to say to future parties that the courts of North Carolina will not endorse conduct that suggests a child was purchased, I would reverse the order of the trial judge.

*In re Adoption of P.E.P.*, 100 N.C. App. at 206-07, 395 S.E.2d at 141-42 (emphasis in original). We agree with Judge Duncan's dissent in this case. The actions taken by Hargrave representing the adopting parents in effectuating this private adoption were totally unacceptable. This case involves more than the resolution of the issues between the parties, important as they may be. The

IN RE ADOPTION OF P.E.P.

[329 N.C. 692 (1991)]

integrity of the judicial system is at stake, and this Court declines to place its imprimatur upon this fatally flawed adoption proceeding.

We think it appropriate to call attention to the following statement of Justice Seawell in *In re Holder*, 218 N.C. 136, 141-42, 10 S.E.2d 620, 623 (1940):

> Considering the nature and great importance of the adoption of children into the home and family in comparison with most other transactions of life, it seems to us amazing that so little regard is often paid to the vital necessity of legality. The necessary steps are easy to understand and easy to observe, and only a fair degree of attention at the right time will serve to prevent frustration, disappointment and heartbreak.

*Id.*

The procedural safeguards provided in the adoption statutes are not mere window dressing—they serve to protect the interests of the parties, the child, and the public. We hold that the statutory violations, together with numerous other irregularities, under the circumstances of this case require that the interlocutory decree be set aside and the adoption proceeding dismissed, subject only to the provisions of N.C.G.S. § 48-20(c).[2]

Reversed and remanded.

Justice WEBB dissenting.

The majority ignores the overarching purpose of Chapter 48 and exalts form over substance in its application of the statutes therein. I am convinced that the majority of the Court of Appeals correctly applied the relevant law consistent with legislative intent and adhered to the proper scope of appellate review of the trial court's findings.

The controlling, salient consideration in adoption cases is the interest of the child. As expressed by the General Assembly,

> [t]he primary purpose of this Chapter is to protect children from unnecessary separation from parents who might give them good homes and loving care, . . . and to protect them from

---

2. Contrary to dissenting opinion filed herewith, we do not decide the question of custody of the child. *See* N.C.G.S. § 48-20(c).

> interference, long after they have become properly adjusted
> in their adoptive homes[,] by biological parents who may have
> some legal claim because of a defect in the adoption procedure.
> . . . The secondary purpose of this Chapter is . . . to prevent
> later disturbance of [the adoptive parents'] relationship to the
> child by biological parents whose legal rights have not been
> fully protected.

N.C.G.S. § 48-1(1), (2) (1984). The Legislature also expressly provided that "[w]hen the interests of a child and those of an adult are in conflict, such conflict should be resolved in favor of the child; and to that end this Chapter should be liberally construed." N.C.G.S. § 48-1(3) (1984).

In cases involving adoption issues, wide discretion is afforded the trial court, *see In re Spinks*, 32 N.C. App. 422, 428, 232 S.E.2d 479, 483 (1977), because the trial court, having the opportunity to observe the parties and evaluate the evidence, can decide what outcome is in the child's best interest. *White v. White*, 90 N.C. App. 553, 557, 369 S.E.2d 92, 97 (1988). When parties appeal from such a determination, the trial court's findings of fact are binding on the appellate court if there is evidence to support the findings. *In re Montgomery*, 311 N.C. 101, 110, 316 S.E.2d 246, 252-53 (1984).

In determining whether to set aside the interlocutory decree, the trial court made findings of fact. The findings pertaining to the individuals, rather than to the procedural provisions of Chapter 48, should be given the most weight in determining whether living with Rowe and Rogers or with the PEPs is in the child's best interest.

The trial court found that Rogers and Rowe were not married at the time of the action and that the two

> have had a difficult relationship. Rogers decided to move from
> their joint residence and took their child, Benjamin, with her.
> Rowe tried to find her and tried to serve a summons on her
> in a court action. Rogers left . . . her whereabouts secret
> from him while she was in North Carolina. After she returned
> to Michigan, they engaged in a court action over Benjamin
> until they reached the aforementioned consent order.

The trial court also noted that the couple began cohabitating again in December 1988, when this action was filed. Further, the court found as fact that although Rowe instituted an action to legitimize Benjamin, the order did not mention the child who is the subject

**IN RE ADOPTION OF P.E.P.**

[329 N.C. 692 (1991)]

of this action. The court also noted that Rowe's assertions of paternity and Rogers' assertions (made *after* entry of the interlocutory decree) were the only evidence that he is the biological father, and that prior to entry of the decree Rogers claimed that Rowe was not the father.

In contrast, the trial court found as fact that Mr. PEP earns $46,000 in his employment with the United States Environmental Protection Agency; Mrs. PEP stays at home with the child; that "the child is being well cared for by the" PEPs; that the PEPs "are fit and proper persons to have the care, custody, and control of the minor child"; and that "it is in the best interest of the minor child to remain in the care, custody and control of" the PEPs.

Based on these findings of fact, the trial court concluded that to uphold the interlocutory decree and to remain with the PEPs was in the minor child's best interest. My review of the record reveals that these findings are supported by competent evidence. Whether Rowe is the father is not certain, as the biological mother took different positions on this point at different times. Further, Rowe and Rogers cannot be said to have a stable home in which to raise the minor child; the couple argued for many months over legitimization of Benjamin before signing a consent decree, and Rogers moved from the couple's residence for seven months in the year preceding this action.

Notably, at the time the trial court made its findings of fact, the PEPs had had custody of the minor child for almost nine months. In that time, the PEPs fed, clothed, and cared for the child. The PEPs are the only parents this minor child knows. It defies reason to conclude that it is in the child's best interest now, when he is three years old, to remove him from his home, where he is well cared for, and place him with two individuals who have an obviously difficult relationship.

The majority opinion focuses not on the best interest of the child but on the purported violations of three statutes and concludes that "the statutory violations, together with numerous other irregularities, under the circumstances of this case require that the interlocutory decree be set aside." The majority cites N.C.G.S. § 48-3(a) (1990), which states that a child need not be born in this state to be adopted here, and asserts that the attorney, Hargrave, violated this statute. The majority blatantly misapplies the statute, however; the statute merely provides that a child may be adopted

**IN RE ADOPTION OF P.E.P.**

[329 N.C. 692 (1991)]

here, regardless of state of birth. It follows, then, that a *violation* of this statute would occur only if an agency or a trial court prevented an adoption because the child was not born in this state. Hargrave misstated the law, but the uncontradicted evidence is that he thought Rogers in fact had to give birth in North Carolina. Clearly, misstating the law does not constitute a violation of N.C.G.S. § 48-3(a).

Another statute cited is N.C.G.S. § 1A-1, Rule 4(j1) (1990), the process provision in North Carolina Rules of Civil Procedure. As noted above, Rogers at different times gave conflicting information about the biological father's identity. If Rowe is not the father, he has no right to notice in any form.

Assuming, arguendo, that Rowe is the father, on the facts of this case a technical violation of N.C.G.S. § 1A-1, Rule 4(j1) is not of such compelling import as to justify removing the minor child from his home.

The majority writes that "Spruit [Rowe's attorney] did not accept service on behalf of Rowe." In this the majority misreads the record. The trial court in its findings of fact stated the following:

> On September 27, 1988, Hargrave wrote to Richard Spruit, Rowe's Michigan attorney, advising him that Hargrave was handling the adoption of the child, and that Hargrave had received information that Rowe has asserted that he was the father and that Pamela Rogers denied it. Hargrave indicated that he wished to serve Rowe with notice of the Petition for Adoption, and *enclosed a copy of the notice of service of process by publication*, a Denial of Paternity form and a Waiver of Rights to the Child form. (Emphasis added.)

> Hargrave asked Spruit if he would accept service, and if not, that he would have to serve Rowe by means of the Sheriff.

> On October 4, 1988, Spruit wrote Hargrave confirming receipt of the September 27, 1988 letter, and indicated that he had forwarded the information to Rowe and would respond in the future. Spruit indicated in the letter that "as of the present time, [Rowe] is certain that he is the father of the child, and will not voluntarily consent to the adoption."

> There is no further contact between Hargrave and Rowe until Rowe intervened in this matter. Rowe was aware of the adoption proceeding in North Craolina [sic].

IN RE ADOPTION OF P.E.P.

[329 N.C. 692 (1991)]

These findings, which are supported by competent evidence, indicate that Rowe received notice. The record does not indicate whether Hargrave's correspondence with Spruit was by certified or registered mail, the manner of dispatch mentioned in Rule 4. There also is no evidence to indicate that Hargrave had access to Rowe's address. Spruit never informed Hargrave that Spruit would not accept service of process on behalf of Rowe; quite to the contrary, Spruit informed Hargrave that he was sending the documents (including notice of service by publication) to Rowe and that Spruit would contact Hargrave to convey Rowe's "position in this matter." In any event, Rowe had actual notice of the proceedings. In using the failure to conform to the notice provisions as one of the three crucial legs upon which its opinion rests, the majority "truly exalt[s] form over substance." *Power Co. v. Winebarger*, 300 N.C. 57, 68, 265 S.E.2d 227, 234 (1980). Where the fundamental consideration is the best interest of the child, and where actual notice exists, the prophylactic function of N.C.G.S. § 1A-1 vis-a-vis rights of potentially affected individuals does not justify removing the minor child from his home.

The third statute the majority emphasized prohibits compensation to parties involved in an adoption or, more simply stated, buying babies. The majority asserts that the trial court must look to the motives of the adopting parents and their attorney, rather than the motive of the mother.

N.C.G.S. § 48-37 provides that "[n]o person . . . shall offer or give, charge or *accept* any fee, compensation, consideration or thing of value for receiving or placing, arranging the placement of, or assisting in placing or arranging the placement of, any child for adoption. . . ." N.C.G.S. § 48-37 (1984) (emphasis added). The provision explicitly applies both to persons who give and who accept anything of value for receiving or placing a child for adoption. Thus, its application is bilateral, and the majority errs in suggesting that the focus should be only on the motives of the PEPs and their attorney. Notably, the statute makes no mention of motive. The prohibition clearly applies to someone in Rogers' position just as certainly as to someone in the PEPs' or Hargrave's position. In this case, it appears that both parties have violated this statutory provision. The General Assembly has provided that anyone violating the statute is guilty of a misdemeanor. Setting aside an adoption decree is not among the sanctions the Legislature ordered.

Given the bilateral nature of the violations, the proceeding was tainted on both sides. Thus, as required by Chapter 48, the compelling consideration of the best interests of the child must be determinative. I conclude that, while the conduct of Rogers, Hargrave, and the PEPs is reprehensible, the minor child's interest will be best served by allowing the child to remain in the PEPs' home. As of this writing, the child is three years old. To uproot him and separate him from his adoptive parents to place him with his biological mother, who also violated the statute by accepting the support, is nonsensical.

For the foregoing reasons, I vote to uphold the interlocutory decree.